# CASS COUNTY, MINNESOTA, ET AL. v. LEECH LAKE BAND OF CHIPPEWA INDIANS

No. 97–174.   Argued February 24, 1998—Decided June 8, 1998

104

THOMAS, J., delivered the opinion for a unanimous Court.

*Earl E. Maus* argued the cause for petitioners. With him on the briefs were *Mark B. Levinger* and *James W. Neher*, Assistant Attorneys General of Minnesota.

*James M. Schoessler* argued the cause for respondent. With him on the brief were *Steven G. Thorne* and *Joseph F. Halloran*.

*Barbara McDowell* argued the cause for the United States as *amicus curiae* urging affirmance. With her on the brief were *Solicitor General Waxman, Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler*, and *James C. Kilbourne.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Michigan et al. by *Frank J. Kelley*, Attorney General of Michigan, *Thomas L. Casey*, Solicitor General, and *R. John Wernet, Jr.*, Assistant Attorney General, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Daniel E. Lungren* of California, *Gale A. Norton* of Colorado, *Alan G. Lance* of Idaho, *Thomas J. Miller* of Iowa, *Joseph P. Mazurek* of Montana, *Dennis C. Vacco* of New York, *W. A. Drew Edmondson* of Oklahoma, and *Jan Graham* of Utah; for Lewis County, Idaho, et al. by *Tom D. Tobin, James M. Johnson, Kimron Torgerson, Michael Jesse*, and *Herbert Wm. Gillespie*; and for the National Association of Counties et al. by *Richard Ruda* and *Carter G. Phillips*.

Briefs of *amici curiae* urging affirmance were filed for the Confederated Tribes and Bands of the Yakama Indian Nation by *Tim Weaver*; for the Grand Portage Band of Chippewa et al. by *Vanya S. Hogen-Kind*; for the Hoopa Valley Tribe et al. by *Michael J. Wahoske*; for the Lummi Indian Tribe by *Harry L. Johnsen III* and *Judith K. Bush*; for the Saginaw Chippewa Indian Tribe of Michigan by *Frank R. Jozwiak* and *K. Allison*

JUSTICE THOMAS delivered the opinion of the Court.

We granted certiorari in this case to resolve whether state and local governments may tax reservation land that was made alienable by Congress and sold to non-Indians by the Federal Government, but was later repurchased by a tribe. We hold that ad valorem taxes may be imposed upon such land because, under the test established by our precedents, Congress has made "unmistakably clear" its intent to allow such taxation.

## I

The Leech Lake Band of Chippewa Indians is a federally recognized Indian tribe. The Leech Lake Reservation, which today encompasses 588,684 acres within the northern Minnesota counties of Cass, Itasca, and Beltrami, was established by federal treaty in 1855 and was augmented by subsequent treaties and Executive Orders.

During the late 19th century, the Federal Government changed its policy of setting aside reservation lands exclusively for Indian tribes under federal supervision. The new "allotment" policy removed significant portions of reservation land from tribal ownership and federal protection, allotting some parcels to individual Indians and providing for other parcels to be sold to non-Indians. See *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation,* 502 U. S. 251, 253–254 (1992); F. Cohen, Handbook of Federal Indian Law 127–138 (1982). The purpose of the policy was to assimilate Indians into American society and to open reservation lands to ownership by non-Indians. *Id.,* at 128.

Most of the allotments made by the Federal Government were implemented pursuant to the General Allotment Act of

*McGaw;* and for the National Congress of American Indians by *Tracy A. Labin* and *Kim Jerome Gottschalk.*

Briefs of *amici curiae* were filed for the Citizens Equal Rights Alliance by *Douglas Y. Freeman;* for the Oneida Indian Nation of New York by *William W. Taylor III* and *Michael R. Smith;* and for the Tribes of Forest County Potawatomi Community et al. by *Carol Brown Biermeier.*

1887 (GAA), 24 Stat. 388, as amended, 25 U. S. C. § 331 *et seq.*
Section 5 of the GAA provided that parcels of tribal land
would be patented to individual Indians and held in trust
by the United States for a 25-year period, after which the
Federal Government would convey title to the individual
allottees—

> "in fee, discharged of said trust and free of all charge or
> incumbrance whatsoever .... And if any conveyance
> shall be made of the lands set apart and allotted as
> herein provided, or any contract made touching the
> same, before the expiration of the time above mentioned,
> such conveyance or contract shall be absolutely null and
> void . . . ." 25 U. S. C. § 348.

Section 6 of the GAA, as originally enacted in 1887, provided
that "each and every member of the respective bands or
tribes of Indians to whom allotments have been made shall
have the benefit of and be subject to the laws, both civil and
criminal, of the State or Territory in which they may reside."
24 Stat. 388. In 1905, this Court interpreted § 6 to mean
that Indian allottees were subject to plenary state jurisdic-
tion immediately upon issuance of the trust patent. See *In
re Heff*, 197 U. S. 488.

The following year, Congress reversed the result of *In re
Heff* by passing the Burke Act, 34 Stat. 182, 25 U. S. C. § 349,
which amended § 6 of the GAA to provide that state jurisdic-
tion did not attach until the end of the 25-year trust period,
when the lands were conveyed to the Indians in fee. The
Burke Act also contained a proviso to the effect that the
Secretary of the Interior could, if "satisfied that any Indian
allottee is competent and capable of managing his or her af-
fairs," authorize issuance of a fee simple patent to the land
before the end of the usual trust period, "and thereafter all
restrictions as to sale, incumbrance, or taxation of said land
shall be removed . . . ." *Ibid.*

For the Leech Lake Band and other Chippewa Tribes in Minnesota, the allotment policy was implemented through the Nelson Act of 1889. 25 Stat. 642. The Nelson Act provided for the "complete cession and relinquishment" of tribal title to all reservation land in the State of Minnesota, except for parts of two reservations, to the United States. After such "complete cession and relinquishment," which "operate[d] as a complete extinguishment of Indian title," the lands were to be disposed of in one of three ways: under § 3, the United States would allot parcels to individual tribe members as provided in the GAA; under §§ 4 and 5, so-called "pine lands" (surveyed 40-acre lots with standing or growing pine timber) were to be sold by the United States at public auction to the highest bidder; and under § 6, the remainder of the reservation land (called "agricultural lands") was to be sold by the United States to non-Indian settlers under the provisions of the Homestead Act of 1862, 12 Stat. 392.

In 1934, federal Indian policy shifted dramatically when Congress enacted the Indian Reorganization Act, 48 Stat. 984, 25 U. S. C. § 461 *et seq.*, which ended the practice of making federal allotments to individual Indians. Although the Reorganization Act did not repeal allotment statutes such as the Nelson Act, it extended the trust period for lands already allotted but not yet fee patented, provided that unallotted surplus lands would be restored to tribal ownership, and allowed additional lands "within or without existing reservations" to be acquired by the Federal Government for the tribes. See §§ 461, 462, 463, 465.

In 1977, the Leech Lake Band and individual Band members owned only about 27,000 acres—less than five percent— of Leech Lake Reservation land. See *State* v. *Forge*, 262 N. W. 2d 341, 343, and n. 1 (Minn. 1977). Since then, the Leech Lake Band has sought to reestablish its land base by purchasing back parcels of reservation land that were allotted to individual Indians or sold to non-Indians during the allotment period.

In 1992, we held in *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation, supra,* that a county could assess ad valorem taxes on reservation land owned in fee by individual Indians or the tribe and originally made alienable when patented in fee simple under the GAA.

In 1993, Cass County began assessing ad valorem taxes on 21 parcels of reservation land that had been alienated from tribal control under the various provisions of the Nelson Act and later reacquired by the Leech Lake Band. Thirteen of the parcels had been allotted to individual Indians under § 3; seven had been sold to non-Indians as pine lands under §§ 4 and 5 for commercial timber harvest; and one parcel had been distributed to a non-Indian under § 6 as a homestead plot. Under protest and to avoid foreclosure, the Leech Lake Band paid more than $64,000 in taxes, interest, and penalties.

In 1995, the Band filed suit in federal court seeking a declaratory judgment that Cass County could not tax the 21 parcels.[1] The District Court granted summary judgment in favor of Cass County, holding that all of the land that had been alienated from tribal ownership under the Nelson Act was taxable. 908 F. Supp. 689 (Minn. 1995). The District Court interpreted our decision in *Yakima* to mean that "if Congress has made Indian land freely alienable, states may tax the land"—that is, "alienability equals taxability." 908 F. Supp., at 693.

A divided panel of the United States Court of Appeals for the Eighth Circuit affirmed in part and reversed in part. 108 F. 3d 820 (1997). Noting that *Yakima* reaffirmed prior statements by this Court indicating that Congress must make "unmistakably clear" its intent to subject reservation lands to state or local taxation, 108 F. 3d, at 826, the panel

---

[1] Also in 1995, the Band successfully applied, pursuant to § 465 of the Indian Reorganization Act, 25 U. S. C. § 465, to restore 11 of the parcels to federal trust status. See *infra,* at 114–115; App. to Pet. for Cert. 56; Tr. of Oral Arg. 9.

majority held that the 13 parcels allotted to individual Indians under § 3 of the Nelson Act could be taxed so long as the District Court confirmed on remand that they had been patented after passage of the Burke Act proviso, because the explicit mention of "taxation" in the proviso manifested the necessary "unmistakably clear" intent. *Id.*, at 827, 829–830. But the panel majority further held that the eight parcels sold as pine lands or homestead land under §§ 4–6 of the Nelson Act could not be taxed because those sections, "unlike § 3, did not incorporate the GAA or include any mention of an intent to tax lands distributed under them which might become reacquired by the Band in fee." *Id.*, at 829.

Judge Magill concurred with the majority on the taxability of the 13 allotted parcels, but he dissented from the holding that the remaining 8 parcels were not also taxable. In his view, *Yakima* propounded "the clear rule . . . that alienability allows taxation." 108 F. 3d, at 831.

We granted certiorari, 522 U. S. 944 (1997), to decide whether Cass County may impose its ad valorem property tax on the seven parcels sold as pine lands and the one sold as a homestead to non-Indians.[2]

## II

State and local governments may not tax Indian reservation land "'absent cession of jurisdiction or other federal statutes permitting it.'" *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation,* 502 U. S., at 258 (quoting *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145, 148 (1973)). We have consistently declined to find that Congress has authorized such taxation unless it has "'made its intention to do so unmistakably clear.'" *Yakima, supra,* at 258 (quoting *Montana* v. *Blackfeet Tribe,* 471 U. S. 759, 765 (1985)). We have determined that Congress has manifested

---

[2] We denied the cross-petition for a writ of certiorari filed by the Band, which sought review of the holding by the courts below that the 13 parcels allotted to Indians under § 3 of the Nelson Act are taxable.

such an intent when it has authorized reservation lands to be allotted in fee to individual Indians, thus making the lands freely alienable and withdrawing them from federal protection. This was the case in both *Yakima* and *Goudy* v. *Meath*, 203 U. S. 146 (1906), in which this Court held that land, allotted and patented in fee to individual Indians and thus rendered freely alienable after the expiration of federal trust status, was subject to county ad valorem taxes even though it was within a reservation and held by either individual Indians or a tribe.

In *Goudy*, Congress had made reservation land alienable by authorizing the President to issue patents to individual members of the Puyallup Tribe. The President issued such a patent to the plaintiff shortly before Washington became a State. The treaty of March 16, 1854, between the United States and the Puyallup Tribe, 10 Stat. 1043, provided that such fee-patented land "shall be exempt from levy, sale, or forfeiture" until a state constitution was adopted and the state legislature removed the restrictions with Congress' consent. When Washington became a State, its legislature passed a law authorizing the sale of reservation lands; shortly thereafter, Congress authorized the appointment of a commission with the power to superintend the sale of those lands, with the proviso that "the Indian allottees shall not have power of alienation of the allotted lands not selected for sale by said Commission for a period of ten years from the date of the passage of this act." 27 Stat. 633 (1893).

When the 10-year period expired, the county levied an ad valorem tax on the land. This Court held that the tax was permissible because the land was freely alienable. *Goudy* v. *Meath*, 203 U. S., at 149–150. Although the Indian patent owner argued that there had been no express repeal of the exemption provided by the 1854 treaty, this Court stated that such an express repeal was unnecessary:

> "That Congress may grant the power of voluntary sale, while withholding the land from taxation or forced alien-

ation may be conceded. . . . But while Congress may make such provision, its intent to do so should be clearly manifested." *Id*, at 149.

The *Goudy* Court concluded that it would "seem strange [for Congress] to withdraw [federal] protection and permit the Indian to dispose of his lands as he pleases, while at the same time releasing [the lands] from taxation." *Ibid.* Indeed, because such congressional purpose would be unreasonable, Congress would have to "clearly manifest" such a contrary purpose in order to counteract the consequence of taxability that ordinarily flows from alienability. *Ibid.*

In *Yakima*, we considered whether the GAA manifested an unmistakably clear intent to allow state and local taxation of reservation lands allotted under the GAA and owned in fee by either the Yakima Indian Nation or individual Indians.[3] In holding that the lands could be taxed, we noted that the Burke Act proviso clearly manifested such an intent by expressly addressing the taxability of fee-patented land. 502 U. S., at 259. We also indicated that the alienability of allotted lands itself, as provided by § 5 of the GAA, similarly manifested an unmistakably clear intent to allow taxation.[4] We reasoned that *Goudy*, "without even mentioning the

---

[3] We are concerned here only with *Yakima*'s holding with respect to ad valorem taxes such as those at issue in this case. *Yakima* also held that the GAA did not authorize the county to impose an excise tax on the *sale* of land held by individual Indians or by the tribe, because such a tax did not constitute the "taxation of land." See *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation*, 502 U. S. 251, 268–269 (1992). That holding, however, is not relevant to this case, which involves only an ad valorem tax on land itself, rather than an excise tax on a transaction.

[4] The Burke Act proviso, as noted, see *supra*, at 107, did not itself authorize taxation of fee-patented land; it merely altered the result of *In re Heff*, 197 U. S. 488 (1905), as to when parcels allotted to the Indians could be alienated and taxed. *In re Heff* had held this occurred as soon as allotted lands were patented to the Indians in *trust* (during which the land would still be under the protection of the Federal Government); the Burke Act proviso stated that this did not occur until the lands were patented in *fee*.

Burke Act proviso," 502 U. S., at 259, had held that state tax laws applied to the Indian allottee at the expiration of the trust period: "[I]t was the alienability of the allotted lands . . . that the *[Goudy]* Court found of central significance." *Id.*, at 263 (emphasis deleted). And we reiterated *Goudy's* point that, although it is *possible* for Congress to render reservation land alienable and still forbid States to tax it, this unlikely arrangement would not be presumed unless Congress "clearly manifested" such an intent. 502 U. S., at 263 (internal quotation marks and citation omitted).

The Court of Appeals thus erred in concluding that our holding in *Yakima* turned on the Burke Act proviso's express reference to taxability. *Yakima,* like *Goudy,* stands for the proposition that when Congress makes reservation lands freely alienable, it is "unmistakably clear" that Congress intends that land to be taxable by state and local governments, unless a contrary intent is "clearly manifested." 502 U. S., at 263.

The foregoing principle controls the disposition of this case. In §§ 5 and 6 of the Nelson Act, Congress provided for the public sale of pine lands and agricultural "homestead" lands by the Federal Government to non-Indians. Congress thereby removed that reservation land from federal protection and made it fully alienable. Under *Goudy* and *Yakima,* therefore, it is taxable. Indeed, this conclusion flows *a fortiori* from *Goudy* and *Yakima:* Those cases establish that Congress clearly intended reservation lands conveyed in fee to *Indians* to be subject to taxation; hence Congress surely intended reservation lands conveyed in fee to *non-Indians* also to be taxable. The Court of Appeals' contrary holding attributes to Congress the odd intent that parcels conveyed to *Indians* are to assume taxable status, while parcels sold to the *general public* are to remain tax exempt.

The Band essentially argues that, although its tax immunity lay dormant during the period when the eight parcels were held by non-Indians, its reacquisition of the lands in

fee rendered them nontaxable once again. We reject this contention. As explained, once Congress has demonstrated (as it has here) a clear intent to subject the land to taxation by making it alienable, Congress must make an unmistakably clear statement in order to render it nontaxable. See *County of Yakima* v. *Confederated Tribes and Bands of Yakima Nation*, 502 U.S., at 263 (citing *Goudy* v. *Meath*, *supra*, at 149). The subsequent repurchase of reservation land by a tribe does not manifest any congressional intent to reassume federal protection of that land and to oust state taxing authority—particularly when Congress explicitly relinquished such protection many years before.

Further, if we were to accept the Leech Lake Band's argument, it would render partially superfluous § 465 of the Indian Reorganization Act. That section grants the Secretary of the Interior authority to place land in trust, to be held by the Federal Government for the benefit of the Indians and to be exempt from state and local taxation after assuming such status:

> "The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, and interest in lands . . . within or without existing reservations . . . for the purpose of providing land for Indians. . . .
>
> "Title to any lands . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands . . . shall be exempt from State and local taxation." 25 U. S. C. § 465.

In § 465, therefore, Congress has explicitly set forth a procedure by which lands held by Indian tribes may become tax exempt. It would render this procedure unnecessary, as far as exemption from taxation is concerned, if we held that tax-exempt status automatically attaches when a tribe acquires reservation land. The Leech Lake Band apparently realizes

this, because in 1995 it successfully applied to the Secretary of the Interior under § 465 to restore federal trust status to seven of the eight parcels at issue here. See Complaint ¶ 18 and Affidavit of Joseph F. Halloran in support of Plaintiff's Motion for Summary Judgment, in Civ. No. 5–95–99, ¶ V (DC Minn.); Tr. of Oral Arg. 9.[5]

\*   \*   \*

When Congress makes Indian reservation land freely alienable, it manifests an unmistakably clear intent to render such land subject to state and local taxation. The repurchase of such land by an Indian tribe does not cause the land to reassume tax-exempt status. The eight parcels at issue here were therefore taxable unless and until they were restored to federal trust protection under § 465. The judgment of the Court of Appeals with respect to those lands is reversed.

*It is so ordered.*

---

[5] The Leech Lake Band and the United States, as *amicus*, also argue that the parcels at issue here are not alienable—and therefore not taxable—under the terms of the Indian Nonintercourse Act, which provides: "No purchase, grant, lease, or other conveyance of lands . . . from any Indian nation or tribe . . . shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U. S. C. § 177.

This Court has never determined whether the Indian Nonintercourse Act, which was enacted in 1834, applies to land that has been rendered alienable by Congress and later reacquired by an Indian tribe. Because the parcels at issue here are not alienable—and therefore not taxable—under the terms of the Indian Nonintercourse Act, which provides: "No taxation if it remains freely alienable", and because it was not addressed by the Court of Appeals, we decline to consider it for the first time in this Court. See, *e. g., Matsushita Elec. Indus. Co.* v. *Epstein,* 516 U. S. 367, 379, n. 5 (1996) (declining to address issue both because it was "outside the scope of the question presented in this Court" and because "we generally do not address arguments that were not the basis for the decision below").