Dear Mr. LeJeune:
Your request for an Attorney General's Opinion has been directed to me for response. You have asked whether off-reservation farm land purchased by the Coushatta Tribe is exempt from property taxes. You do not say, but it will be assumed, that the land in question has not been taken in trust by the U.S. Government for the benefit of the Tribe.
Most of the statutory authority and jurisprudence relating to the taxation of Indian land is more concerned with which Indian land is not taxable rather than that which is. One leading commentator on Indian law has written the following concerning the taxability of Indian land outside of Indian country:
 "Tribal property located outside the governmental jurisdiction of the tribe (that is, outside tribal Indian country) has been the subject of few contests over state taxes. Most tribal real property is associated with tribal Indian country and thus not subject to state taxing jurisdiction in any case. Some statutes specify that particular off-reservation interests shall be taxable or nontaxable. In one contested case, lands purchased for a tribe and taken in trust were held nontaxable. Other off-reservation interests have been assumed by all concerned to be taxable when unrestricted and previously taxable, and nontaxable when held in trust." F. Cohen, Handbook of Federal Indian Law 429-430 (1982).
A case which speaks to the question at issue is, Mescalero Apache Tribev. Jones, 411 U.S. 145, 148-149, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114
(1973). In this case the Tribe operated a ski resort on off-reservation land leased from the United States Forest Service. The State attempted to impose a tax on the gross receipts of the ski resort. It also attempted to levy a use tax on certain personalty purchased out of State and used in the construction of the ski lifts. The Court found that in the factual circumstances of the case, one or more provisions of the Indian Reorganization Act rendered the land tax-exempt and would make it immune from the State's ad valorem property tax. Further, the Court concluded that "the same immunity extends to the compensating use tax on the property. However, it did permit the imposition of the gross receipts tax. Significantly, the Court clearly stated that:
 "[A]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State. . . . That principle is as relevant to a State's tax laws as it is to state criminal laws." (Emphasis added)
Therefore, the U.S. Supreme Court in Mescalero affirmed that a State's non-discriminatory tax law may be applicable to Indian tribes once their activities move off-reservation. Had the ski resort been located on off-reservation, non-trust fee land of the tribe or land leased from other than the federal government, it appears reasonable to conclude that the Court would have even approved the use or property tax.
In Salt River Pima-Maricopa Indian Community v. Yavapai, County,50 F.3d 739 (1995), the United States Court of Appeals, Ninth Circuit, upheld the right of the County to impose ad valorem real and personal property taxes on a $55,000,000 off-reservation cement plant the Tribe had purchased. In doing so, the Court stated:
 "It is well-established that states have the right to impose taxes on Indian property located outside the boundaries of reservations, so long as the tax is nondiscriminatory."
The Court also stated that:
 "States retain `the right to tax, unless Congress forbade it, all Indian land and Indian activities located or occurring `outside of an Indian reservation'."
Additionally, there is a line of jurisprudence in which the U.S. Supreme Court dealt, in large part, with the extent to which the Indian General Allotment Act (25 U.S.C.A. §§ 348, 349) and related legislation, permitted state and/or local taxation of reservation land which had been allotted to members of the tribe and, in some cases, sold or otherwise conveyed to non-Indians. As far as this writer is aware, the General Allotment Act did not have application in Louisiana. Therefore, because of the central nature of the General Allotment Act to these cases and because they dealt with "reservation land," they do not deal directly with the factual situation you have posed. However, they do appear to add something to this discussion.
The latest of these cases is Cass County, Minnesota v. Leech Lake Bandof Chippewa Indians, 524 U.S. 103, 118 S.Ct. 1904. In this case the Court dealt, in part, with a situation in which a Minnesota county had imposed a tax on Indian reservation land which Congress had made freely alienable. "The Leech Lake Band of Chippewa Indians sought declaratory and injunctive relief and the refund of taxes, interest, and penalties paid on land that the Band had reacquired in fee simple after allotment to members or conveyance to non-Indians." Speaking for the Court, Justice Thomas stated:
 "We granted certiorari in this case to resolve whether state and local governments may tax reservation land that was made alienable by Congress and sold to non-Indians by the Federal Government, but was later repurchased by a tribe. We hold that ad valorem taxes may be imposed upon such land because, under the test established by our precedents, Congress has made `unmistakably clear' its intent to allow such taxation."
The Court reasoned that:
 "The Band essentially argues that, although its tax immunity lay dormant during the period when the eight parcels were held by non-Indians, its reacquisition of the lands in *114 fee rendered them non-taxable once again. We reject this contention. As explained, once Congress has demonstrated (as it has here) a clear intent to submit the land to taxation by making it alienable, Congress must make an unmistakably clear statement in order to render it non-taxable. . . . The subsequent repurchase of reservation land by a tribe does not manifest any congressional intent to reassume federal protection of that land and to oust state taxing authority — particularly when Congress explicitly relinquished such protection many years before." (Emphasis added)
The Court went on to make another point which is relevant to this opinion. The Court stated:
 "Further, if we were to accept the Leech Lake Band's argument, it would render partially superfluous § 465 of the Indian Reorganization Act. That section grants the Secretary of the Interior authority to place land in trust, to be held by the federal government for the benefit of the Indians and to be exempt from state and local taxation after assuming such status:
 `The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, and interest in lands . . . within or without existing reservations . . . for the purpose of providing land for Indians. . . .
 `Title to any lands . . . shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands . . . shall be exempt from State and local taxation.' 25 U.S.C. § 465.
 In § 465, therefore, Congress has explicitly set forth a procedure by which lands held by Indian tribes may become tax-exempt. It would render this procedure unnecessary, as far as exemption from taxation is concerned, if we held that tax-exempt status automatically attaches when a tribe acquires reservation land." (Emphasis added)
The Court finally concluded:
 ". . . The repurchase of such land by an Indian tribe does not cause the land to reassume tax-exempt status. The eight parcels at issue here were therefore taxable unless and until they were restored to federal trust protection under § 465."
(Emphasis added)
As previously observed, Cass County and the prior cases in that line of jurisprudence dealt with the Indian General Allotment Act and "reservation" land, and, therefore, are not directly applicable to the question you have asked. However, it appears that these cases are not without implication for the issue at hand. The implication is that if former tax-exempt reservation land which had been allotted to members of the tribe or conveyed to non-Indians is repurchased by the Tribe and tax-exempt status does not, by virtue of tribal ownership, automatically attach (or reattach) to that land, it seems even more apparent that when land which is "freely alienable" and has never been tax-exempt reservation land is purchased by a tribe, that tax-exempt status does not automatically attach to the land, simply because a Tribe purchases it. Such land remains subject to property taxes, unless and until it is taken in trust by the federal government for the benefit of the tribe; or, unless and until some other special legislation or circumstance renders it tax-exempt. Moreover, to adopt a contrary position would, as the Court stated in Cass County, "render partially superfluous § 465 of the Indian Reorganization Act."
Accordingly, it is the opinion of this office that, barring some special legislation or circumstance, the farm land purchased by the Coushatta Indian Tribe, but which has not been taken in trust by the United States Government for the use and benefit of the tribe, is notexempt from the property taxes levied by a political subdivision of the State. Further, this opinion would be equally applicable to other similar off-reservation land purchased by other Indian Tribes in this State.
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 By: __________________________ JAMES A. SMITH, II ASSISTANT ATTORNEY GENERAL
JAS:sab