Kim GOBIN; Guy Madison,
Plaintiffs–Appellees,

v.

SNOHOMISH COUNTY; Stephen Holt, Director, Snohomish County Department of Planning and Development Services, Defendants–Appellants,

v.

The Tulalip Tribes of Washington,
Plaintiff–Intervenor–Appellee.

No. 00–36031.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 6, 2002.

Filed Sept. 18, 2002.

Marc D. Slonim, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA, for the plaintiffs-appellees.

A. Reid Allison III, Tulalip Tribes of Washington, Office of Reservation Attorney, Tulalip, Washington, for the plaintiff-intervenor-appellee.

Todd S. Kim, Department of Justice, Environment & Natural Resources Division, Washington, D.C., for the amicus.

Thomas M. Fitzpatrick, Snohomish County Prosecuting Attorney's Office, Everett, Washington, for the defendants-appellants.

Steven J. Bladek, Snohomish County Prosecuting Attorney's Office, Everett, Washington, for the defendants-appellants.

Before BRUNETTI, TROTT and TALLMAN, Circuit Judges.

## OPINION

TROTT, Circuit Judge:

Snohomish County ("County") asserted land use jurisdiction over a proposed building project located on reservation land owned in fee simple by Kim Gobin and Guy Madison (collectively "Gobin"), registered members of the Tulalip Tribes of Washington ("the Tribes"). Gobin sought a declaratory judgment that the County lacked such jurisdiction over her lands. The district court agreed. We have jurisdiction over the County's timely appeal pursuant to 28 U.S.C. § 1291. We conclude that by making Gobin's fee lands freely alienable and encumberable, Congress did not expressly authorize County jurisdiction over those lands. Neither did exceptional circumstances warrant County jurisdiction in this case. Thus, we affirm.

## BACKGROUND

The County rests between Puget Sound and the Cascade Mountain Range in northwest Washington. Over the past two decades the County's population has increased faster than any county in Washington.

The Tribes constitute a federally recognized Indian Tribe. The Tribes's reservation is located entirely within the County and comprises approximately 1.6% of the County's land area. About two thousand tribal members and eight thousand nonmembers inhabit the reservation's twenty-two thousand acres. The United States holds nearly half the reservation land in trust for the Tribes or individual members. The other half of the reservation is owned in fee simple by tribal members and nonmembers alike.

In 1972, pursuant to Article VI of the tribal Constitution, the Tribes established a comprehensive system of land use regulations and an administrative structure for implementing those regulations. In 1982, the Tribes created a seven-member Planning Commission charged with updating the land use regulations. Over the next decade, the Planning Commission developed a plan "balancing competing economic, development, housing, and natural resource priorities." Upon completion of the revised regulations, the Planning Commission prepared a zoning ordinance and map "to implement and preserve the integrity" of the plan. The zoning ordinance, Ordinance 80, was reviewed and approved by the Bureau of Indian Affairs and the Solicitor's Office in the Department of the Interior.

The Tribes's zoning ordinance, Ordinance 80, establishes use and density restrictions throughout the reservation. It requires a building permit for all new construction and that structures be built in conformity with the Uniform Building Code. It also facilitates development by authorizing rezoning if a proposed project adheres to certain open space and density requirements. Other aspects of the Tribes's land use regulations ensure that building projects include utility easements, water and sewage systems that comply with the Tulalip Utilities Ordinance, a drainage plan based on the Washington Stormwater Management Manual, and protection for environmentally sensitive lands, including wetlands.

Pursuant to Ordinance 80, Gobin submitted to the Tribes an application to rezone and subdivide a twenty-five acre parcel of land located on Fire Trail Road. Gobin's proposed subdivision would connect to septic systems because sewer service is not available on that part of the reservation. Water would flow from wells or private water systems because no established water lines connect to County water, and only Fire Trail Road, which is maintained by the County, would provide access to Gobin's proposed subdivision. Once built,

Gobin planned to market these homes to the general public without regard for tribal affiliation.

Gobin paid the necessary regulatory fees and submitted an environmental checklist addressing environmental impacts, transportation, and public services. The Planning Commission evaluated Gobin's proposal and considered the necessary land use restrictions. The Planning Commission also sought public comments on Gobin's proposal and held public hearings to vet the matter. The Tribes notified the County of Gobin's proposal, but the County neither appeared at the public hearings nor offered any substantive comments. The County indicated only that "if the land is placed in trust, the County will recognize subdivision of individual trust land." "If the land is not acquired in trust, . . . its development will continue to be subject to Snohomish County jurisdiction and the applicable County zoning, subdivision, and development regulations." Under the applicable County regulations, Gobin could construct only ten homes instead of the proposed twenty-five. The County acknowledges that it would reject Gobin's proposed subdivision.

On June 8, 1999, the Tribes conditionally approved Gobin's twenty-five home development project. The conditions included grading restrictions, a buffer surrounding an on-site wetland, erosion and run-off controls, and approval of a public water system by the Tulalip Utilities Authority.

Despite the Tribes's approval, however, Gobin could not begin development without exposing herself to civil and criminal liability because of the County's asserted land use jurisdiction. Moreover, Gobin's lender would not finance the project without resolution of the conflict. Gobin, therefore, sought a judicial declaration that the County "has no land use jurisdiction over lands owned by a member of the Tulalip Tribes and situated within the Reservation, and in particular [has] no jurisdiction to impose County zoning, subdivision and building code regulations on [her] development." The Tribes intervened, seeking a declaration that "the County lacks jurisdiction over the land use activities of[Gobin]."

Gobin and the Tribes moved for summary judgment. The County resisted, arguing that Congress expressly authorized its jurisdiction over reservation fee lands when it made those lands freely alienable and encumberable. In the alternative, the County argued that exceptional circumstances warranted its exercise of jurisdiction over reservation fee lands. The district court rejected the County's arguments. It found no express authorization from Congress and no circumstances so exceptional as to justify interfering with the Tribes's governance of its reservation. The County appealed. The United States appeared as amicus in support of the Tribes.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *United States v. Muckleshoot Indian Tribe*, 235 F.3d 429, 432 (9th Cir.2000). We must determine, viewing the evidence in the light most favorable to the County, whether there exist any genuine issues of material fact, and whether the district court correctly applied the relevant substantive law. *Id.*

## DISCUSSION

The parties agree on the dispositive questions: Whether Congress expressly authorized the County to regulate reservation fee lands owned by tribal members, and whether exceptional circumstances warranted the County's exercise of juris-

diction over the tribal members' activities on those lands. Before turning to these pressing questions, we recount the relevant history.

# I HISTORICAL FRAMEWORK

## A. Allotment Generally

On February 8, 1887, Congress enacted the General Allotment Act ("GAA"), which was amended by the Burke Act in 1906. *See* 24 Stat. 388(GAA); 34 Stat. 182. As amended, the GAA authorized the President to allot tribal lands to individuals and families "in all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use ... by treaty stipulation." 24 Stat. 388. The GAA restricted immediate alienation or encumbrance of these lands by requiring that each parcel be held in trust by the United States for twenty-five years or longer. *Id.* at 389.

Section 5 of the GAA provided that "at the expiration of the trust period, the United States will convey[the land] by patent to [the] Indian ... in fee, discharged of [the trust] and free of all charge or incumbrance...." 25 U.S.C. § 348. Section 6, as amended by the Burke Act, stated that when the lands have been conveyed in fee to the Indians, "then each and every *allottee* shall have the benefit of and be subject to the laws, both criminal and civil, of the State or Territory in which they may reside...." 25 U.S.C. § 349 (emphasis added). Even before the expiration of the trust period however, the Secretary of the Interior could issue a fee patent to an Indian allottee if he determined the allottee could competently manage his affairs *Id.* Upon such a premature patenting, the so-called Burke Act proviso required that "all restrictions as to sale, incumbrance, or taxation of said land shall be removed ...." *Id.*

■ Land speculators took advantage of the ability of the Indians to alien freely their lands. The result: Nearly 90 million acres of land passed out of Indian hands during the allotment policy era. F. Cohen, *Handbook of Federal Indian Law* 614 (1982). To put an end to the allotment of Indian lands, Congress enacted the Indian Reorganization Act in 1934. By this legislation, Congress extended and augmented the existing restrictions on the sale or transfer of Indian lands. 25 U.S.C. §§ 462, 464. The Indian Reorganization Act, however, did not reverse any previous allotment of fee patented lands. It imposed neither restraints on the ability of Indian allottees to alienate or encumber their fee patented lands nor impaired the rights of those non-Indians who had acquired title to over two-thirds of the Indian lands allotted under the GAA. *County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation,* 502 U.S. 251, 255–56, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992).

In 1948, Congress lifted the restrictions imposed by the Indian Reorganization Act and permitted the Secretary of the Interior, "upon application of the Indian owners, to issue patents in fee, to remove restrictions against alienation, and to approve conveyances, with respect to lands or interests in lands held by individual Indians ...." 62 Stat. 236.

## B. Allotment of Gobin's Land

On the Tribes's reservation, some land contains restrictions on use, sale, and taxation. Such restricted lands include those held in trust by the United States for the benefit of the Tribes or individual tribal members as well as lands owned in fee by the Tribes. Currently about 50% of the reservation is classified as restricted land, but the Tribes expects that percentage to rise to 60% as it purchases more fee land.

The County does not assert jurisdiction over any restricted lands.

The remaining reservation land is owned by tribal members and nonmembers in conventional fee simple. This land was allotted pursuant to the Treaty of Point Elliot. 12 Stat. 927 (Jan. 22, 1855). Article VII of that Treaty incorporated Article 6 of the Omaha Treaty, which held that the President was authorized to patent land to individuals or families "conditioned that the tract shall not be aliened or leased for a longer term than two years; and shall be exempt from levy, sale, or forfeiture . . . ." 12 Stat. 927. (incorporating Omaha Treaty, Article 6, 10 Stat. 1043 (Mar. 16, 1854)). These restrictions could be removed by State legislation but only with the consent of Congress. In fact, the restrictions on the land were removed when Washington became a State in 1889. At that time, Indian fee owners obtained the "power to lease, incumber, grant, and alien" fee land in the same manner as other citizens. *Goudy v. Meath*, 203 U.S. 146, 147, 27 S.Ct. 48, 51 L.Ed. 130 (1906).

Gobin's land, in particular, was originally patented to Charley Shelton on April 1, 1885. Shelton's land patent states the land is granted pursuant to the Treaty of Point Elliot and the Omaha Treaty and incorporates the restrictions on alienation found in those Treaties. The parties agree that Shelton's land remained subject to these restrictions on alienation until 1962 when the Secretary of the Interior approved a deed from Charley Shelton's heirs to non-Indians pursuant to the Act of May 14, 1948. Gobin subsequently purchased the land in fee simple in 1998.

## II EXPRESS CONGRESSIONAL AUTHORIZATION

 The policy of leaving Indians free from State jurisdiction is deeply rooted in our Nation's history. *Rice v. Olson*, 324 U.S. 786, 789, 65 S.Ct. 989, 89 L.Ed. 1367 (1945). In determining the extent of State jurisdiction over Indians, State laws are not applicable to tribal Indians on an Indian reservation except where Congress has expressly intended that State laws shall apply. *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 170–71, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). If faced with two reasonable constructions of Congress's intent, this Court resolves the matter in favor of the Indians. *Id.* at 174, 93 S.Ct. 1257.

### A. Alienability[1]

 Here, the County argues broadly that Congress expressly authorized plenary state in rem jurisdiction when it made Indian fee lands freely alienable. At the outset, we note that the County's argument does not turn on whether Gobin's land was patented pursuant to the GAA or the Treaty of Point Elliot. *See Cass County v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 114, 118 S.Ct. 1904, 141 L.Ed.2d 90 (1998) (holding Congress intended to make land allotted pursuant to the Nelson Act subject to tax when making it freely alienable). Indeed, it is undisputed that Gobin's land is freely alienable. If alienability allows plenary State in rem jurisdiction then the County may apply its land use regulations to Gobin's property.

---

**1.** Although section 6 of the GAA provides that "each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside," this section does not provide carte blanche for States to exercise jurisdiction over Indians. In *Moe v. Confederated*

*Salish & Kootenai Tribes*, 425 U.S. 463, 477–79, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), the Supreme Court refused to extend Section 6 beyond its literal coverage ("*each and every allottee*") to include subsequent Indian owners of the allotted parcels.

The County seeks to analogize the facts of this case to those in *County of Yakima*, where the Supreme Court thought that it would be "strange" to "permit the Indian to dispose of his lands as he pleases, while at the same time releasing it [sic] from taxation." 502 U.S. at 263, 112 S.Ct. 683 (quoting *Goudy*, 203 U.S. at 149, 27 S.Ct. 48). The Court believed that Congress would have "clearly manifested" the "strange" intent to allow unrestricted alienation while at the same time withholding the land from taxation or forced alienation. *Id.* (quoting *Goudy*, 203 U.S. at 149, 27 S.Ct. 48). Finding no such clear congressional intent, the Court held that Section 5 unmistakably implied that when land became alienable and encumberable, it also became subject to ad valorem property taxes. *Id.* at 263–64, 112 S.Ct. 683; *see also Cass County*, 524 U.S. at 115, 118 S.Ct. 1904 ("When Congress makes Indian reservation land freely alienable, it manifests an unmistakably clear intent to render such land subject to state and local taxation."); *Lummi Indian Tribe v. Whatcom County*, 5 F.3d 1355, 1358 (9th Cir. 1993) ("[L]and is taxable if it is alienable.").[2]

The Court further held that Section 5's unmistakable implication was made explicit by the Burke Act proviso to Section 6. *County of Yakima*, 502 U.S. at 264, 112 S.Ct. 683. Section 6, as amended, allowed the Secretary of the Interior to issue fee patents to certain allottees before the expiration of the trust period. "Although such a fee patent would not subject its Indian owner to *plenary* state jurisdiction, fee ownership would free the *land* of 'all restrictions as to sale, incumbrance, or taxation.'" *Id.* (emphasis in original, quoting

25 U.S.C. § 349). The Court held that Section 6 reaffirmed, for prematurely patented land, what Section 5 unmistakably implied with respect to patented land generally: Freely alienable fee lands are subject to State ad valorem property taxes. *Id.*

The Court, however, refused to extend the GAA's "taxation of . . . land" to encompass an excise tax the State of Washington wished to levy on the proceeds of the sale of fee patented lands. The Court found that although "taxation of land" could have been reasonably interpreted to include the excise tax, that was not its unambiguous meaning. Thus, faced with multiple reasonable constructions of "taxation of . . . land," the Court interpreted the phrase in favor of the Indians and consequently, refused to impose the excise tax. *Id.* at 269–70, 112 S.Ct. 683.

The Supreme Court has reaffirmed the holding of *County of Yakima* in *Cass County*, 524 U.S. at 114–15, 118 S.Ct. 1904. To date, however, neither the Supreme Court nor this Court has extended *County of Yakima* to find that Congress expressly authorized any other State regulation of the Indians when it made Indian fee lands freely alienable. Indeed, the Court in *County of Yakima* took pains to explain the narrowness of its holding. It held that alienability led inevitably to taxation of land, but not to "taxation with respect to land," "taxation of transactions involving land," or "taxation based on the value of land." *County of Yakima*, 502 U.S. at 269, 112 S.Ct. 683. The Court further limited its holding by requiring that Congress "expressly authorize" other State regulation of Indians on reservation lands and that

---

**2.** In *Lummi Indian Tribe*, we additionally remarked that *County of Yakima's* determination that an implication drawn from Section 5 of the GAA allows State ad valorem taxation of Indian fee lands "may be hard to square

with the requirement" "that Congress' intent to authorize state taxation of Indians must be unmistakably clear." *Lummi Indian Tribe*, 5 F.3d at 1358.

ambiguities of congressional intent be construed in favor of the Indians. *Id.* at 258, 269, 112 S.Ct. 683.

█ In this case, the County seeks an unprecedented extension of *County of Yakima.* It contends that Congress expressly authorized plenary State in rem land use regulation when it made Indian fee lands freely alienable. We disagree. Congress's decision to make Indian fee lands freely alienable is not an express authorization or otherwise an "unmistakably clear" indication that the County may enforce its in rem land use regulations over those lands. Unlike the inextricably linked concepts of (forced) alienation and taxation found in *County of Yakima,* alienation and plenary in rem land use regulation are entirely unrelated. Thus, we hold that the right of Indians to alienate their lands freely does not provide the County with a concomitant right to exert in rem land use regulation over those lands.

## B. Encumberability

The County argues that Congress expressly authorized State land use regulation over Indian fee lands when it made those lands freely encumberable. In the Burke Act proviso, which applies to "all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use," Congress provided that "all restrictions as to ... incumbrance[s] ... of said land" shall be removed upon the patenting of the land in fee. 25 U.S.C. § 349. While the Burke Act does not strictly apply to Gobin's land, it does evince Congress's intent to make alienable lands freely encumberable.

Moreover, as required by The Treaty of Point Elliot (incorporating The Treaty of the Omahas), Congress expressly approved the State of Washington's grant of Indian lands in fee, which empowered Indian recipients to "lease, incumber, grant, and alien" their lands in the same manner and with the same effect as other citizens. *Goudy,* 203 U.S. at 147, 27 S.Ct. 48. The parties agree that Gobin's land is freely encumberable.

Unsurprisingly, the County would define "encumbrance" broadly (and thereby encompass all of its land use regulations) to include any right "in the land to restrict its use in a way that diminishes its value." For support the County cites *Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655, 667–68 (9th Cir.1975), in which we interpreted the ambiguous term "encumbrance," found in Public Law 280, 67 Stat. 589 (1953), to include Kings County's zoning regulations. We interpreted "encumbrance" in that way so as to find ultimately that the County's zoning regulations did *not* apply to the Indians' land. *Id.; see also Snohomish County v. Seattle Disposal Co.,* 70 Wash.2d 668, 672, 425 P.2d 22 (1967) (holding that the County's zoning laws constituted an encumbrance which did not apply to Indian lands).

The United States suggests a narrower definition of encumbrance: A "property interest running with the title-something like a lien, a lease, or an easement." Black's Law Dictionary treads an intermediate course: "Any right to, or interest in, land which may subsist in another to diminution of its value, but consistent with passing of the fee." Black's Law Dictionary 527 (6th ed.1990).

█ Despite the inherent ambiguity in the word "encumbrance" standing alone, here, the operative phrase is "encumbrance *of land.*" The prepositional phrase "of land" necessarily limits the scope of permissible encumbrances. Encumbrances with respect to land or encumbrances of the transactions involving land

or based on the value of the land, therefore, are not permitted. *Id.* at 269.

■ In this case, the County's land use regulations, which prohibit Gobin from building her subdivision, encumber the transactions and activities involving land. The objectionable County density requirement, in particular, does not burden the land itself, but rather burdens the use to which Gobin seeks to put the land. Indeed, apart from Gobin's proposed activities, the County's land use regulations have no force. These regulations resemble the excise tax in *County of Yakima:* Although tangentially related to land, they are not inextricably linked to the land itself. Thus, we hold that Congress did not expressly authorize plenary State land use regulation over Indian fee lands when it made those lands freely encumberable.

## III EXCEPTIONAL CIRCUMSTANCES

■ In "exceptional circumstances," a State may assert jurisdiction over the on-reservation activities of tribal members notwithstanding the lack of express congressional intent to do so. *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 214–15, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (quoting *New Mexico v. Mescalero Apache Tribe,* 462 U.S. 324, 331–32, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983)). The asserted exceptional circumstances are weighed against traditional notions of Indian sovereignty and the congressional goal of encouraging tribal self-determination, self-sufficiency, and economic development. *Id.* at 216, 107 S.Ct. 1083.

In *Moe,* for example, the State of Montana could require tribal smokeshops to collect sales tax from their non-Indian clientele. *Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. at 483, 96 S.Ct. 1634. Montana's interest in collecting cig-

arette taxes from non-Indians outweighed the "minimal burden" imposed on tribal cigarette vendors. *Id.* In *Cabazon Band,* on the other hand, the Supreme Court rejected California's contention that its interest in thwarting organized crime sufficiently warranted imposition of its gambling laws on tribal high-stakes bingo. 480 U.S. at 220–21, 107 S.Ct. 1083. Despite the importance of the State of California's interest in organized crime prevention, it did not outweigh tribal interests in self-determination and self-sufficiency. *Id.*

■ The County suggests an array of interests, including protecting endangered species, regulating County-maintained roads and storm sewers, providing a continuum of land use enforcement for all fee lands, and complying with applicable health and safety codes, to counterbalance the Tribes's strong interests in self-determination. Not only must the County explain why these interests are exceptional, but it must explain why these interests are exceptional for reservation *fee* lands, given the County's inability to regulate reservation lands held in trust. The Tribes contends, in opposition to the County's claims, that its strong interests in self-determination and self-government outweigh the County's interests.

Undoubtedly, the County maintains an important interest in protecting the bull trout and the salmon in Quilceda Creek, as required by the Endangered Species Act. This interest is not exceptional, however, given that the Tribes must also comply with the Endangered Species Act as well as its own strict laws protecting wildlife.

Regulating roads and storm sewers are also important County interests. As the district court held, however, they are not exceptional enough to warrant interference with tribal self-government and self-determination. Presumably, the County al-

**918**

ready manages its roads and storm sewers despite not exercising authority over eleven thousand acres of reservation land held in trust.

Assuring the health and safety of County citizens is also an important interest, but an unexceptional one given the County's lack of jurisdiction on other parts of the reservation. Although the County may assert its health and safety regulations if a non-Indian purchases one of Gobin's homes, such a speculative ability to regulate is insufficient to overcome the Tribes's overwhelming interests.

That Indians and non-Indians might conspire to transfer fee lands back and forth to avoid any County or tribal regulation presents a problem of enforcement best handled jointly by the County and the Tribes in furtherance of their already excellent relationship. Yet such an administrative problem presents no reason for this Court to undermine Indian sovereignty in favor of County regulation.

Even adding these important County interests together, they do not outweigh the Tribes's interest in self-determination. Regardless of the similarities between County and tribal land use regulations or the congenial nature of the parties' relationship, concurrent County and Tribes plenary land use jurisdiction threatens to supplant the Tribes's Ordinances (and thus its attempt at self-government) when the two regulatory regimes diverge. Such County interference with tribal self-determination is not consistent with *Cabazon Band* nor does it constitute a "minimal burden" like the one condoned in *Moe,* 425 U.S. at 483, 96 S.Ct. 1634. Indeed, nothing could be more contrary to the well-established policy of leaving Indians free from state jurisdiction and control. *See McClanahan,* 411 U.S. at 168, 93 S.Ct. 1257.

**CONCLUSION**

For the reasons delineated above, we affirm the district court's decision.

AFFIRMED.