235 F.3d 429 (9th Cir. 2000)
 UNITED STATES OF AMERICA, et al., Plaintiffs,
and
PUYALLUP INDIAN TRIBE; SUQUAMISH INDIAN TRIBE; SWINOMISH INDIAN TRIBAL COMMUNITY, Intervenor-Plaintiffs/ Petitioners-Appellees,
v.
MUCKLESHOOT INDIAN TRIBE, Intervenor-Plaintiff/ Respondent-Appellant,
v.
STATE OF WASHINGTON, et al., Defendants.
 No. 99-35960
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted September 12, 2000
Filed December 13, 2000
 
 Annette Klapstein (argued), Law offices of the Puyallup Indian Tribe, Tacoma, Washington, for intervenor-plaintiff/ petitioner-appellee Puyallup Indian Tribe.
 Scott W. Wheat (argued), Office of Tribal Attorney of the Suquamish Indian Tribe, Suquamish, Washington, for intervenor-plaintiff/petitioner-appellee Suquamish Indian Tribe.
 Alix Foster, Office of the Tribal Attorney of the Swinomish Indian Tribal Community, LaConner, Washington, for intervenor-plaintiff/petitioner-appellee Swinomish Indian Tribe.
 Mason D. Morisset, Morisset, Schlosser, Ayer & Jozwiak, Seattle, Washington, for intervenor-plaintiff/appellee Tulalip Tribes of Washington.
 Gregory M. O'Leary (argued), Seattle, Washington, for intervenor-plaintiff/respondent-appellant Muckleshoot Indian Tribe.
 Appeal from the United States District Court for the Western District of Washington Barbara J. Rothstein, Chief District Judge, Presiding. D.C. No.CV-70-09213-BJR
 Before: Mary M. Schroeder, Robert R. Beezer, and Michael Daly Hawkins, Circuit Judges.
 HAWKINS, Circuit Judge:
 
 
 1
 This appeal concerns the limits of the Muckleshoot Tribe's saltwater usual and accustomed fishing area under the Boldt Decision. Because we agree with the district court that the Muckleshoot's saltwater usual and accustomed fishing area, as found by Judge Boldt, was limited to Elliott Bay, we affirm the grant of summary judgment for the Puyallup, Suquamish, and Swinomish Tribes.
 
 Background and Procedural History
 
 2
 This case centers on the interpretation of a lengthy and detailed district court opinion published in 1974 after an extensive trial involving a voluminous record. In United States v. Washington, 384 F. Supp. 312 (W.D. Wash. 1974) ("the Boldt Decision"), aff'd, 520 F.2d 676 (9th Cir. 1975), Judge Boldt adjudicated the treaty-reserved fishing rights of several tribes in Washington state, including the parties to this dispute. Central to this case is Finding of Fact 76 ("Finding 76") of the opinion, which states:
 
 
 3
 Prior to and during treaty times, the Indian ancestors of the present day Muckleshoot Indians had the usual and accustomed fishing places primarily at locations on the upper Puyallup, the Carbon, Stuck, White, Green, Cedar, and Black Rivers, the tributaries to these rivers (including Soos Creek, Burns Creek and Newaukum Creek) and Lake Washington, and secondarily in the saltwater of Puget Sound. Villages and their weir sites were often located together. [FPTO 3-53; Ex. USA-20, p. 38; Ex. USA-27b, pp. 7-16; Ex. PL-23, pp. 11-12]
 
 
 4
 Id. at 367 (emphasis added) (brackets in original). After the decision was issued, the Muckleshoot Indian Tribe ("the Muckleshoot") opened commercial fisheries in some of the areas designated in Finding 76.
 
 
 5
 Judge Boldt's decision did not explicitly address shellfish entitlements; rather, it concerned the rights to fin fish. The individual tribes' entitlements to shellfish, which are not at issue here, were addressed in a subsequent case, United States v. Washington, 873 F. Supp. 1422 (W.D. Wash. 1994) ("Washington II"), aff'd in part and rev'd in part, 157 F.3d 630 (9th Cir. 1998).
 
 
 6
 After Washington II, the Muckleshoot sought to open fisheries in Area 11 of Puget Sound. Area 11 is a geographically defined region of Puget Sound located to the west of the City of Seattle. Area 11, as a fishing zone, was not defined at the time of Boldt Decision; it was subsequently established by state regulation. In response to this action by the Muckleshoot, the Puyallup Indian Tribe ("the Puyallup") filed a Request for Determination in district court. The Request sought a determination that the Muckleshoot's usual and accustomed ("U&A") saltwater fishing area, as determined by Finding 76 of the Boldt Decision, does not include any areas outside Elliott Bay (now known as Area 10A, like Area 11 a fishing region created by state regulation). With the court's permission, the Suquamish Indian Tribe ("the Suquamish") and the Swinomish Indian Tribal Community ("the Swinomish") filed a Cross-Request for Determination seeking a similar ruling.
 
 
 7
 In January 1998, the Muckleshoot filed a Motion to Dismiss the Request and the Tribes (the Puyallup, Suquamish, Swinomish) filed a Motion for Summary Judgment on their Requests for Determination. On August 5, 1998, the district court granted the Muckleshoot's motion to dismiss with respect to the Tribes' claims that the Muckleshoot had no saltwater fishing rights outside Areas 9, 10, and 11. The court reasoned that it did not have jurisdiction over areas other than Areas 9, 10, and 11 because the Muckleshoot had not manifested an intent to conduct saltwater fishing in Areas other than 9, 10, and 11. The court then denied the Tribes' motion for summary judgment and ordered an evidentiary hearing onwhether Areas 9, 10, and 11 were part of the Muckleshoot's U&A under Finding 76 of the Boldt Decision.
 
 
 8
 Both parties filed Cross-Motions for Summary Judgment. On September 10, 1999, the district court held that the Muckleshoot's U&A under Finding 76 was limited to Elliott Bay (Area 10A) and enjoining the Muckleshoot from fishing in Areas 9, 10, and 11. The Muckleshoot appealed. We have jurisdiction pursuant to 28 U.S.C. 1291 and 1292(a)(1).[1]
 
 Standard of Review
 
 9
 A grant of summary judgment is reviewed de novo. See, e.g., Robi v. Reed, 173 F.3d 736, 739 (9th Cir. 1999), cert. denied, 120 S. Ct. 375 (1999). This court must determine, viewing the evidence in the light most favorable to the appellants, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. See, e.g., Berry v. Valence Tech., Inc., 175 F.3d 699 (9th Cir. 1999), cert. denied, 120 S. Ct. 528 (1999). The court does not weigh the evidence or determine the truth of the matter; rather, the court only decides whether there is a genuine issue of material fact for trial. See Colacurcio v. City of Kent, 163 F.3d 545, 549 (9th Cir. 1998).
 
 Analysis
 I. Ambiguity in Finding 76
 
 10
 This case turns on the interpretation of the phrase "secondarily in the waters of Puget Sound" as used by Judge Boldt in Finding 76. The case, therefore, resembles one of statutory construction, with the Boldt Decision serving as the instrument to be interpreted. The Muckleshoot's argument is essentially one of plain meaning. According to the Muckleshoot, the text of Finding 76 is unambiguous because "Puget Sound" has a well-understood, common geographical meaning. If Judge Boldt, who was intimately familiar with the geography of the region and its relevance to the case, meant to confine the Muckleshoot's saltwater U&A to inner Elliott Bay, the Muckleshoot contend Judge Boldt could have expressly done so in Finding 76.
 
 
 11
 The Tribes counter that the phrase is ambiguous when examined in the context of the evidence before Judge Boldt. Given the evidence that Judge Boldt relied upon and other Findings of Fact and Law in the opinion, the Tribes argue that Judge Boldt could not have intended to include the expansive area claimed by the Muckleshoot as part of their saltwater U&A. Cf. Children's Hosp. & Health Ctr. v. Belshe, 188 F.3d 1090, 1096 (9th Cir. 1999) ("To determine the plain meaning of a statutory provision, we examine not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy.").
 
 
 12
 The parallels between this case and one of statutory construction should not be overemphasized. There are important distinctions between interpreting a judicial opinion and a statute. First, the documents and the evidence the court relied upon, which are the rough equivalent of legislative history, play a much larger and more definitive role in interpreting the judicial text than do the traditional components of legislative history in statutory interpretation. Finding 76 specifically cites the supporting documents used as the bases for its conclusions. There is no question, then, that the court relied upon this information in reaching its decision. Moreover, in referencing the documents cited in Finding 76, Judge Boldt said, "The court finds that in specific facts, the reports of Dr. Barbara Lane, Exhibits USA-20 to 30 and USA-53, have been exceptionally well researched and reported and are established by a preponderance of the evidence. They are found to be authoritative and reliable summaries of relevant aspects of Indian life in the case area at and prior to the time of the treaties . . . ." Washington, 384 F. Supp. at 350.
 
 
 13
 More importantly, judicial opinions are simply not statutes and the rules governing the interpretation of the two reflect this. In general, there are no canons of construction for theinterpretation of opinions, reflecting the fact that textual precision, while a highly valued judicial quality, is at the very center of statutory interpretation. See, e.g. , United States v. Partlow, 159 F.3d 1218, 1219 (9th Cir. 1998) (where the terms of a statute are unambiguous, its plain meaning must control).
 
 
 14
 Opinions, unlike statutes, are not usually written with the knowledge or expectation that each and every word may be the subject of searching analysis. Acknowledging this fact, this court held long ago that the "language of the court must be read in the light of the facts before it." Julian Petroleum Co. v. Courtney Petroleum Co., 22 F.2d 360, 362 (9th Cir. 1927); see also Marshall v. Andrew F. Mahony Co. , 56 F.2d 74, 78 (9th Cir. 1932) ("[T]he language of all cases must be taken and understood in light of the facts of the case in which the language was employed.").
 
 
 15
 With these concepts in mind, the parties' debate over whether the language of Finding 76 is unambiguous is largely misdirected, inasmuch as an analysis of the decision is necessary, whether the text is unambiguous or not, in order to understand Finding 76 "in light of the facts of the case." An unambiguous text is certainly a factor to be considered in this analysis, but it does not necessarily terminate the inquiry.
 
 
 16
 Our decision in Muckleshoot Tribe v. Lummi Indian Tribe, 141 F.3d 1355 (9th Cir. 1998), supports this proposition. There, this court did not merely rely on what appeared to be unambiguous language, the meaning of "Whidbey Island," in a previous judicial finding also authored by Judge Boldt. Rather, the court went beyond the plain language and examined the evidence, concluding that the Swinomish Tribe "offered no evidence that suggests that [the Finding of Fact] is ambiguous or that the court intended something other than its apparent meaning." Id. at 1358 (emphasis added).
 
 
 17
 As the district court recognized in this case, the Tribes have brought forth precisely such evidence. We agree with the district court's conclusion:
 
 
 18
 [T]he evidence before Judge Boldt establishes, at a minimum, that the Muckleshoot's predecessors may have occassionally fished in the open waters of Elliott Bay near the mouth of the Duwamish and gathered shellfish on the shores of Elliott Bay. Based on this evidence, the court concludes that Judge Boldt intended to include those areas (Department of Fisheries Area 10A) in the Muckleshoot U&A . . . . The court finds, however, that there is [sic] no evidence in the record before Judge Boldt, nor is it per suaded by extra-record evidence, that Judge Boldt intended to describe a saltwater U&A any larger than the open water and shores of Elliott Bay. The court agrees with the Muckleshoot that Judge Boldt's use of a broad term like "Puget Sound" is perplexing in light of the geographic precision he generally used in describing U&As. And it agrees that, as a resident of the Puget Sound area, it is fair to assume that he would not have used the terms "Elliott Bay" and "Puget Sound" interchangeably. However, there is no evidence in the record before Judge Boldt that supports a [saltwater] U&A beyond Elliott Bay.
 
 
 19
 This conclusion is based on our analysis of the information before Judge Boldt. The Muckleshoot's arguments to the contrary are unpersuasive.
 
 II. The Evidence Before Judge Boldt
 A. Evidence Referenced by Judge Boldt
 
 20
 As the district court recognized, the most relevant evidence in determining what Judge Boldt intended by the phrase "secondarily in the saltwater of Puget Sound" consists of the four documents referenced in Finding 76. The first document, the final pretrial order, uses language nearly identical to that in Finding 76 and is, therefore, not very helpful.
 
 
 21
 The second document, Exhibit USA-20, p. 38, is a portion of Dr. Lane's "Conclusions Based on Available Documents and Ethnographic Data." This report, which describes the fishing practices of the Muckleshoot's ancestors, who signed the treaty Judge Boldt was interpreting, concludes that "[t]he principle fisheries of the ancestors of the Muckleshoot both prior to and during treaty times included Green River, White River, Stuck River, Cedar River, and tributary creeks."
 
 
 22
 The third document, Exhibit USA-27b, pp. 7-16, provides an extensive discussion of the fishing practices of the Muckleshoot's ancestors. The relevant portion of the discussion states:
 
 
 23
 The traditional fisheries of the [ancestors of the] Muckleshoot included but were not limited to Puyal lup and Carbon Rivers and tributary creeks; the Stuck, White, Green and Cedar rivers and tributary creeks; and Lake Washington. In addition there was some trolling for salmon in salt waters when families descended the rivers to get shell fish supplies on the beaches of the Sound.
 
 
 24
 The last document listed in Finding 76 is Exhibit PL-23, pp. 11-12, a portion of a report of Dr. Carroll Riley. The report describes the area where the Muckleshoot's ancestors lived and, like the other documents, concludes that the ancestor tribes relied primarily on freshwater fishing:"[T]he Indians in this area obtained the greatest part of their subsistence from fish caught in the White and Green Rivers . . .. They occasionally made the trip down river to Elliott Bay on fishing and clamming expeditions."
 
 
 25
 These documents indicate that the Muckleshoot's ancestors were almost entirely an upriver people who primarily relied on freshwater fishing for their livelihoods. Insofar as they conducted saltwater fishing, the referenced documents contain no evidence indicating that such fishing occurred with regularity anywhere beyond Elliott Bay.
 
 
 26
 This conclusion is buttressed by other evidence before Judge Boldt. The reports that Judge Boldt relied upon make a general distinction between downriver predecessor tribes, also referred to as saltwater tribes, and upriver tribes. The predecessor tribes to the Muckleshoot were considered to be upriver tribes. In an excerpt from the anthropological report of Dr. Lane, the Muckleshoot's ancestors are described as having "lived in treaty times in about twenty villages on the Duwamish and upper Puyallup drainage systems." These ancestors, according to Dr. Lane, were " `upriver' people in contrast to those people living directly on the bays and lower reaches of the river."
 
 
 27
 The Muckleshoot's ancestors may have occasionally conducted saltwater fishing beyond Elliott Bay. But it is important to remember that Judge Boldt was deciding the "usual and accustomed" fishing grounds under the provisions of the Treaties. Isolated or infrequent excursions beyond Elliott Bay do not meet the "usual and accustomed" standard.[2] The documents listed in Finding 76 do not indicate the existence of saltwater fishing beyond Elliott Bay that was more than "incidental" or "occasional."
 
 B. The Muckleshoot's Arguments
 
 28
 The Muckleshoot's argument that their ancestors conducted saltwater fishing beyond Elliott Bay rests on four pieces of evidence: (1) Dr. Lane's reports; (2) Dr. Carroll Riley's report; (3) excerpts from a book by the anthropologist Marian Smith; and (4) testimony of Puyallup tribal members given before the Indian Claims Commission ("ICC") in the 1950s. None of these establishes that the Muckleshoot's ancestors had U&A fishing grounds beyond Elliott Bay.
 
 1. Dr. Lane's Reports
 
 29
 a. Exhibit USA-27b
 
 
 30
 The Muckleshoot contend that Exhibit USA-27b is the key document for the purpose of ascertaining the intended scope of the phrase "secondarily in the saltwater of Puget Sound." The Muckleshoot first argue that the report's statement that "there was some trolling for salmon in salt water when families descended the rivers to get the shell fish supplies on the beaches of the sound" is regional in scope and broader than Elliott Bay. Judge Boldt adapted the phrase "on the beachesof Puget Sound," the Muckleshoot contend, to mean "in the saltwater of Puget Sound" to conform with the description of the trolling in Dr. Lane's report and to emphasize the inclusion of waters in Puget Sound and not merely the beaches. The Muckleshoot also argue that the phrase "the beaches of Puget Sound" has a plain meaning which is broader than Elliott Bay and that Dr. Lane did not mention Elliott Bay at all in her description of the Muckleshoot's saltwater U&A.
 
 
 31
 Addressing the last point first, the lack of a discussion of Elliott Bay in Dr. Lane's report works against the Muckleshoot's argument, not for it. Dr. Lane's report lists the saltwater U&As for those tribes that she believed engaged in significant saltwater fishing. The only tribes for which there is no mention of specific saltwater fisheries are three upriver tribes, including the Muckleshoot. This feature of the report suggests two conclusions -(1) the phrase "on the beaches of Puget Sound" was used because there was no established (i.e. U&A) saltwater fishing location anywhere and (2) the omission of "Puget Sound" from Dr. Lane's findings in Exhibit USA-20, which lists the principal fisheries of the Muckleshoot's ancestors, was not inadvertent or inconsequential. Rather, it suggests that Puget Sound was not a principal saltwater fishing ground.
 
 
 32
 More importantly, all references in Dr. Lane's report on Muckleshoot saltwater fishing only pertain to saltwater fisheries in the Duwamish drainage system. The Duwamish empties only into Elliott Bay. Nowhere in Dr. Lane's report is there a reference to the Muckleshoot's ancestors fishing on a drainage system that empties anywhere outside Elliott Bay.
 
 
 33
 The only other reference to saltwater in Dr. Lane's report is the statement, in Exhibit USA-27b and listed in Finding 76, "In addition, there was some trolling for salmon in salt water when families descended upon the rivers to get shell fish supplies on the beaches of the sound." This statement does not establish that the Muckleshoot's ancestors had any saltwater U&A outside Elliott Bay. The rivers that the families "descended upon" are those referenced in the preceding sentence -the Puyallup, Carbon, Stuck, White, Green, and Cedar. At the time of the treaty, the White, Green, and Cedar rivers flowed into the then-existent Black River which became the Duwamish River and emptied into Elliott Bay. This is consistent with Dr. Lane's use of the term "Duwamish drainage system" throughout her report. The "beaches of Puget Sound" that the Muckleshoot's ancestors would reach after descending the White, Green, and Cedar rivers were the beaches of Elliott Bay and those beaches alone.
 
 
 34
 Of the remaining rivers, the Stuck flowed south from the White River and into the Puyallup and the Carbon River was a tributary of the upper Puyallup. At treaty time, the lower Puyallup was within the territory of the Puyallup Tribe andthe Muckleshoot's ancestors could not have descended all the way down the Puyallup River without entering Puyallup territory. Because these fishing grounds "on the beaches of Puget Sound" are within the exclusive territory of the present-day Puyallup Reservation, the Muckleshoot cannot claim them as part of their U&A territory.[3] Thus the only referenced rivers that are not part of the Duwamish drainage system cannot yield the Muckleshoot saltwater U&A rights.[4]
 
 
 35
 b. Seasonal Fishing
 
 
 36
 Dr. Lane's report, cited as Exhibit USA-27a, explains that the villages of the Muckleshoot's ancestors "were only occupied by the entire village group during the winter season. At other times of the year, portions of the population de-camped in different directions to secure food and other supplies." Judge Boldt recognized this when he wrote, "[M]ost groups claimed autumn fishing use rights in the waters near to their winter villages. Spring and summer fishing areas were often more distantly located and often were shared with other groups from other villages." Washington, 384 F. Supp. at 353. The facts before Judge Boldt show that the Muckleshoot's ancestors did not regularly fish outside Elliott Bay, even during the spring and summer fishing seasons.
 
 
 37
 First, the above statements contained in Exhibit USA-27b were not specifically referenced in Finding 76, so their relevance should not be overemphasized. More importantly, the evidence cited by the Muckleshoot does not establish that any seasonal saltwater fishing areas beyond Elliott Bay were usedby their ancestors with enough regularity to establish them as U&A grounds. See also Washington, 384 F. Supp. at 351 (Finding 14) ("Marine waters were also used as thoroughfares for travel by Indians who trolled en route. Such occasional and incidental trolling was not considered to make the marine waters traveled thereon the usual and accustomed fishing grounds of the traveling Indians.") (internal exhibit references omitted).
 
 
 38
 c. Specific Sites Listed in Dr. Lane's Report
 
 
 39
 The Muckleshoot claim that Appendix 2 to Dr. Lane's report, which contains excerpts from T.T. Waterman's manuscript describing field work done from 1917 through 1920, contains information on sites beyond Elliott Bay where the Muckleshoot's ancestors fished. But the excerpts in Appendix 2 can only be understood with reference to Waterman's findings in Appendix 1. In his listing of "Duwamish Villages on the eastern side of the Sound," Waterman lumped together both upriver and downriver (or saltwater) tribes. Dr. Lane, however, made a distinction between the two groups, finding that the downriver tribes were not ancestors of the Muckleshoot. Thus, it cannot be said that the sites listed in Appendix 2 were fishing grounds of the Muckleshoot's ancestors.
 
 
 40
 Moreover, Appendix 1 contains a list, selected by Dr. Lane from Waterman's manuscripts, of place names used by treaty time bands, including the ancestors of tribes other than the Muckleshoot. The list does not include any saltwater sites. Finally, Appendix 1 contains a map of Muckleshoot fishing cities. This map only includes sites on rivers; there are no saltwater sites marked. Given this background, that Appendix 2 does not specifically identify the Muckleshoot ancestor sites, and that the evidence contained in Appendix 2 is only briefly mentioned in Dr. Lane's reports, the Muckleshoot have failed to demonstrate that the evidence established treaty-time saltwater U&As beyond Elliott Bay.
 
 
 41
 The Muckleshoot also claim that another appendix to Dr. Lane's report, a statement by the anthropologist Marian Smith that people from the upper Puyallup valley made "special trips to the Sound in the neighborhood of what is now Redondo Beach" to catch devil fish, supports their reading of Finding 76. The excerpt states that the devil fish, i.e. octopi, were not fished. Rather, "[t]hey were picked up while asleep along the shore . . . ." Consequently, the excerpt does not establish a basis for a saltwater U&A at Redondo Beach even if the Muckleshoot's ancestors engaged in this form of collection.
 
 2. Dr. Riley's Report (Exhibit PL-23)
 
 42
 Dr. Riley's report, which was cited in Finding 76, says that the Muckleshoot's treaty-time ancestors "occasionally made the trip down-river to Elliott Bay on fishing and clamming expeditions." The Muckleshoot argue that this statement means that Judge Boldt implicitly rejected limiting the saltwater U&A to Elliott Bay and chose instead a much broader area. If Judge Boldt had intended to define the U&A as Elliott Bay, the Muckleshoot contend, then he could have done so very simply and Dr. Riley's report would have provided the evidentiary basis for such a finding.
 
 
 43
 The Muckleshoot are correct when they contend that Judge Boldt specifically said that Dr. Lane's testimony prevails over Dr. Riley's in the event of a conflict between the two. See Washington, 384 F. Supp. at 350. Contrary to the Muckleshoot's assertion, however, there is no conflict between Dr. Lane and Dr. Riley on this matter. As discussed above, Dr Lane's reference to the "beaches of Puget Sound " does not encompass, based on the evidence, an area beyond Elliott Bay. Even if it did, it would be odd for Judge Boldt to have included a contrary reference, the testimony of Dr. Riley, in Finding 76 for the purpose of implicitly rejecting it.
 
 3. ICC Testimony
 
 44
 The Muckleshoot point to the findings of fact made by the ICC in 1966 in a case involving the Puyallup Tribe. The ICC found that the testimony before it "tend[ed ] to show" that the "islands in southern Puget Sound" were used jointly by a number of treaty-time tribes, including the ancestors of the Muckleshoot. The Muckleshoot maintain that this finding supports a broad reading of "saltwater of Puget Sound" in Judge Boldt's decision. This is incorrect.
 
 
 45
 In a post-trial substantive order, Judge Boldt said that an ICC finding in a case involving land claims of the Nooksack Tribe[5] "in no way dealt with asserted Indian treaty fishing rights." United States v. Washington, 459 F. Supp. 1020, 1042 (W.D. Wash. 1978). The evidence in the ICC report is insufficient to support a broad reading of Dr. Lane's phrase "the beaches of Puget Sound" or Finding 76's phrase "the saltwater of Puget Sound." Even assuming fishing did take place, there is nothing in the ICC finding to indicate that it met the requirements of "usual and accustomed."
 
 4. Excerpts from Marian Smith's Book
 
 46
 The Muckleshoot argue that excerpts, introduced at the underlying trial, from Marian Smith's book, The PuyallupNisqually, also establish that the Muckleshoot's ancestors lived and fished in Puget Sound beyond Elliott Bay. According to Smith, people from the village at the forks of the White and Green rivers came to the area around present-day Redondo Beach to gather shellfish. These Indians included the treaty-time ancestors of the Muckleshoot. See Washington, 384 F. Supp. at 366 ("Indians from the Green and White River areas . . . and some Indians from the upriver portions of the Puyallup River . . . were removed and consolidated on the Muckleshoot Reservation.")
 
 
 47
 This evidence is also insufficient to establish a saltwater U&A beyond Elliott Bay. Smith's account does not establish that the Muckleshoot's ancestors trolled the waters of Redondo Beach. As discussed above, Smith's findings were that these people collected devil fish on the "shores" of Redondo Beach. This finding is not inconsistent with a determination by Judge Boldt that the Muckleshoot's ancestors did not engage in U&A saltwater fishing beyond Elliott Bay.
 
 Conclusion
 
 48
 The district court's grant of summary judgment is AFFIRMED.
 
 
 49
 Appellant Muckleshoot Indian Tribe's Motion for Judicial Notice of Maps and Intervenor-Plaintiffs/Petitioners Appellees Puyallup Indian Tribe's, Suquamish Indian Tribe'sand Swinomish Indian Tribal Community's Motion to Strike are denied as moot.
 
 
 
 Notes:
 
 
 [1]
 The district court did not certify its judgment as a final order under Fed. R. Civ. P. 54(b). The matter before the court was a sub proceeding and the court's judgment was final as to the issues in the sub proceeding. See Van Cauwenberghe v. Biard, 486 U.S. 517, 521-22 (1988) (stating that final judgment "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment") (internal quotation marks omitted). Jurisdiction under section 1291 is therefore proper. Jurisdiction also lies under 1292(a)(1) to review the district court's award of injunctive relief.
 
 
 [2]
 Explaining the scope of "usual and accustomed," Judge Boldt said:
 Although there is no evidence of the precise understanding the Indians had of the treaty language, the treaty commissioners probably used the term [ ] `usual and accustomed' . . . in [its] common parlance, and the meaning of [it] as found in a contemporaneous dictionary most likely would be what was intended by the government representatives. The 1828 and 1862 editions of Webster's American Dictionary of the English Language define the term as follows:
 accustomed: Being familiar by use; habituated, inured . . . usual; often practiced
 . . .
 usual: Customary; common; frequent; such as occurs in ordi nary practice or in the ordinary course of events.
 . . . The words `usual and accustomed' were probably used in their restrictive sense, not intending to include areas where use was occasional or incidental.
 Washington, 384 F. Supp. at 356.
 
 
 [3]
 "An exclusive right of fishing was reserved by the tribes within the area and boundary waters of their reservations." Washington, 384 F. Supp. at 332.
 
 
 [4]
 The Muckleshoot contend that it is relevant that the Puyallup Reservation did not exist before the treaties. This point is irrelevant to Judge Boldt's determination that exclusive fishing rights exist on present-day reservations.
 
 
 [5]
 The ICC finding relied upon by Muckleshoot also involves a dispute related solely to land claims and not involving fishing.