**Dana Leigh THOMPSON, Plaintiff–Appellant,**

v.

**COUNTY OF FRANKLIN and Bryon A. Varin, Treasurer of Franklin County, Defendants–Appellees.**

**Docket No. 01–7107.**

United States Court of Appeals, Second Circuit.

Argued Oct. 24, 2001.

Decided Dec. 09, 2002.

Arlinda F. Locklear, Law Office of Arlinda Locklear, Jefferson, MD, for Appellant.

Richard J. Holwell, White & Case, New York, NY, for Defendants–Appellees.

Hans Walker, Jr., Hobbs, Straus, Dean & Walker, Washington, DC, for Amicus Curiae, St. Regis Mohawk Indian Tribe.

William W. Taylor, III, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, DC, for Amicus Curiae, Oneida Indian Nation of New York.

Before VAN GRAAFEILAND, WINTER, and SACK, Circuit Judges.

Judge WINTER concurs in a separate opinion.

Judge SACK dissents in a separate opinion.

VAN GRAAFEILAND, Senior Circuit Judge.

On February 27, 1989, Larry Thompson conveyed by warranty deed to Dana Leigh Bush two parcels of land in Franklin County, New York, totaling approximately 68 acres. On an undisclosed date, Dana

Leigh Bush became Dana Leigh Thompson, presumably the wife of Larry. When and where this marriage took place, we do not know. Dana contends, however, that the land in question is part of a St. Regis Mohawk Indian Reservation and that, because she is a member of that tribe, she is not required to pay county taxes on the property. The district court, McCurn, J., disagreed. So do I. In short, I do not believe this is a case that permits of summary disposition in Dana's favor, as she contends.

The record contains little information about Dana and Larry and their roles in the litigated processes. We are left largely in the dark concerning the nature of the property involved and the people who populate it. Nevertheless, Dana commenced this action for a declaratory judgment in an effort to establish her claim and sought summary judgment towards that end. In so doing, she carried "at a minimum the risk of non-persuasion, if not the actual burden of proof." *NRT Metals, Inc. v. Manhattan Metals (Non–Ferrous), Ltd.,* 576 F.Supp. 1046, 1052 n. 17 (S.D.N.Y. 1983).

By a process of osmosis from reading lengthy arguments, opinions and testimonial excerpts, I am convinced that living in the disputed area during the period at issue left much to be desired. Smuggling over the nearby Canadian border was rampant. Millions of dollars were involved. Conflicts between factions, involving both personal injuries and deaths, were constant. Gambling was for high stakes and thus inherently dangerous. Judicial descriptions of the conditions that prevailed used such terms as "intensely disputed," "ongoing discord," "feuding factions," "continuing strife," and "procedural wrongdoing." *See Ransom v. Babbitt,* 69 F.Supp.2d 141 (D.D.C.1999).

In *Thomas v. United States,* 141 F.Supp.2d 1185, 1202 (W.D.Wis.2001), the court described the situation as follows:

After operating under a Three Chief System of government for almost two hundred years, the Saint Regis Mohawk Tribe conducted a referendum election to determine whether to adopt a tribal constitution with a three branch system (executive, judicial and legislative). Following the election, there was a dispute within the tribe whether a sufficient majority of the tribe had voted in favor of the referendum. The tribe held additional referendum elections, the results of which indicated that the majority of the tribe believed that the original referendum had been certified improperly and that the new constitution lacked legal authority. Although the tribe had selected leaders for the Three Chiefs System, the Bureau of Indian Affairs continued to support the new constitution, recognize the three-branch government and provide federal funds to the new government only. The three elected chiefs brought suit against United States officials under the Administrative Procedures Act, alleging that the defendants had refused wrongfully to recognize them as the tribe's legitimate government leaders. The district court held that the Bureau of Indian Affairs and Interior Board of Indian Appeals had "acted arbitrarily, capriciously, and contrary to law" refusing to review for themselves the intensely disputed tribal procedures surrounding the adoption of a tribal constitution, in crediting unreasonable decisions of a seemingly invalid tribal court, and in refusing to grant official recognition to the clear will of the Tribe's people with regard to their government.

A principal reason for the discord and strife seems to have been the activity of tribal members known as the **"Warriors"**,

who wanted to control the tribe, particularly its money-making activities such as smuggling and gaming. Apparently, both Larry and Dana belonged to this faction, and had problems with the police as a result of their activities as such.

In the midst of the turmoil above described, Dana submitted her resignation from the Tribe. The resignation, contained in a letter addressed to the tribe, stated:

"To all whom these presents may come, be seen, or known, I, Dana Leigh Thompson, born on September 1, 1956, do renounce and abjure, including but not limited to, explicit or implied, citizenship, protection, jurisdiction, and representation of/by, including but not limited to, the St. Regis Mohawk Tribal Council, the Peoples Government, the Mohawk Council of Akwesasne, the Mohawk Nation Council, the Kanienkehaka Nation Council, the United States of America, Canada, the Iriquois Confederacy, Great Britain, and the Assembly of First nations.

In furtherance of this declaration, I adamantly request that my name be immediately removed from the citizenship/membership roll of, including but not limited to, the Saint Regis Mohawk Tribe, the Mohawks of Akwesasne, the Peoples Government, and the Mowhawk Nation.

Be it fully understood that I have repudiated all, including but not limited to, citizenship, protection, jurisdiction, and representation of/by the Mowhawk Councils of Akwesasne, as well as others herein stated.

Recent actions, agreements, negotiations, and adverse mannerisms are construed as attempts to, extinguish, apply treaty to, limit, impede, and/or otherwise restrict the existent Aboriginal Community of Akwesasne from exercising their inherent sovereign powers and sovereign right to independently organize, as explicitly stipulated by the definitive principles embodied within the Two Row Wampum, including but not limited to, the right to enjoy a common and peaceful coexistence.

I did not participate, and will not, including but not limited to, condone, ratify, sanction, or agree to, the actions of the aforementioned sovereign or quasi-sovereign government entities, nor will I be bound by their actions.

I further state and declare, that I am resident in Akwesasne and reside on Akwesasne Territory."

(App. at 203.)

I believe that, in view of the tribal disarray described above, the issue of whether the letter containing Dana's resignation was delivered to and accepted by a constitutionally authorized tribal officer or officers merited more proof than was offered. *See, e.g., Askew v. Hargrave,* 401 U.S. 476, 478–79, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971). I also believe that the proper disposition of Dana's claim requires more information concerning the roles that Dana and Larry played in the legal maneuvering that led to Larry's acquisition of title and his conveyance to Dana. In layman's terms, we should know with what we are dealing here. Some information concerning Larry's background and prior conduct would be helpful in arriving at a correct conclusion.

Although I believe that the effect of Dana's purported resignation cannot be determined on motion, I nonetheless conclude that the land in question is subject to taxation. The deeds to and from Larry contain no restrictions on alienation, and there are no extraneous restrictions between the parties. In any event, any other restrictions could have been imposed only

by Congress. The parties agreed, however, that there were no such restrictions.

The parties both agree that Ms. Thompson's land is freely alienable:

> THE COURT: Okay. It seems to be apparent throughout your—both briefings that you have given the Court on both sides that there are no restrictions on alienability.
>
> Ms. LOCKLEAR: That is correct, Your Honor.
>
> THE COURT: Do either party claim such a restriction?
>
> Ms. LOCKLEAR: No, Your Honor.
>
> THE COURT: Mr. Peebles, you don't?
>
> MR. PEEBLES: No, Your Honor.

(App. at 115.)

As Justice Thomas, writing for a unanimous court, stated in *Cass County v. Leech Lake Band of Chippewa Indians,* 524 U.S. 103, 118 S.Ct. 1904, 141 L.Ed.2d 90 (1998), "once Congress has demonstrated ... a clear intent to subject the land to taxation by making it alienable, Congress must make an unmistakably clear statement in order to render it nontaxable." *Id.* at 114, 118 S.Ct. 1904 (citing *County of Yakima v. Confederated Tribes and Bands of Yakima Nation,* 502 U.S. 251, 263, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992) (citing *Goudy v. Meath,* 203 U.S. 146, 149, 27 S.Ct. 48, 51 L.Ed. 130 (1906))).

Here, we find Congressional intent to make land alienable in the form of the Indian Nonintercourse Act (INA),[1] which is an "act of Congress" in every sense of that term. The INA provides that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177. Surely the converse of this statement is true, *i.e.,* if such a conveyance *is* made by treaty or convention entered into pursuant to the Constitution, then that conveyance *is* otherwise valid.

In *Goudy,* the Supreme Court recognized that:

> the purpose of the restriction upon voluntary alienation is protection of the Indian from the cunning and rapacity of his white neighbors, and it would seem strange to withdraw this protection and permit the Indian to dispose of his lands as he pleases, while at the same time releasing it from taxation....

*Id.* at 149, 27 S.Ct. 48. The INA is just such a restriction upon voluntary alienation, and it would be equally "strange" to hold that a conveyance governed by, and in compliance with, the INA did not also act to permit state taxation of the land so conveyed. *See also Yakima,* 502 U.S. at 263, 112 S.Ct. 683 ("it was the *alienability of the allotted lands* ... that the Court found of central significance"). In light of the unique relationship between Congress and Indian land, *see generally Johnson v. McIntosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823) (mem.), such a conveyance clearly evinces federal cession of jurisdiction. Accordingly, land made alienable by a conveyance governed by and in compli-

---

1. The Act, "also known as the Indian Trade and Intercourse Act, was enacted by the first Congress in 1790 and has been reenacted in substantially the same form by subsequent Congresses to the present date." *Canadian St. Regis Band of Mohawk Indians v. New York,* 146 F.Supp.2d 170, 174 n. 2 (N.D.N.Y. 2001) (McCurn, *J.*). *See also Lummi Indian Tribe v. Whatcom County,* 5 F.3d 1355, 1358 (9th Cir.1993) ("The Act has not changed materially since its passage, in 1790, at the insistence of President Washington and Secretary of War Henry Knox." (parallel citations omitted)).

ance with the INA is land made alienable by Congress, and hence taxable.[2]

Nothing in *Thompson v. County of Franklin (Thompson I)*, 15 F.3d 245 (2d Cir.1994), is to the contrary.[3] In deciding only Dana's standing to challenge Franklin County's taxation of her property in that case, we held that the INA, which addresses only title, had no relevance because the issue of title and the question of jurisdiction were legally distinct. *See, e.g., Oneida County, N.Y. v. Oneida Indian Nation of N.Y. State*, 470 U.S. 226, 240, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) ("the Nonintercourse Acts simply 'put in statutory form what was or came to be the accepted rule—that the extinguishment of Indian title required the consent of the United States.'" (quoting *Oneida Indian Nation of N.Y. State v. County of Oneida, N.Y.*, 414 U.S. 661, 678, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974))); *Mohegan Tribe v. Connecticut*, 638 F.2d 612 (2d Cir.1980) (detailing history of INA). Thus, as we held in *Thompson I*, that Plaintiff is an individual Indian and not an Indian tribe does not affect her standing to challenge taxability.

Nor does this mark a departure from our prior cases that establish the elements of a prima facie case *based on a violation of the Act. See, e.g., Canadian St. Regis Band of Mohawk Indians v. New York*, 146 F.Supp.2d 170, 185 (N.D.N.Y.2001) ("In order to establish a *prima facie* case based on a violation of the Act, 'a plaintiff must show that (1) it is an Indian tribe, (2) the land is tribal land, (3) the United States has never consented to or approved the alienation of the this [*sic*] tribal land, and (4) the trust relationship between the United States and the tribe has not been terminated or abandoned.'") (quoting *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58 (2d Cir.1994)). Plaintiff's case is not based on a violation of the Act, *i.e.*, she is not suing "under the Act." In fact, as she points out, it would be ludicrous for her to assert such a violation, because the validity of her own title depends on compliance, rather than noncompliance, with the Act.

After 1796, land within the boundaries of the original St. Regis reservation could not have been alienated absent compliance with the Indian Nonintercourse Act. The parties' concession concerning absence of restrictions necessarily operates as a stipulation that the conveyances leading to Dana's own title necessarily complied with that Act. *See Sinicropi v. Milone*, 915 F.2d 66,68 (2d Cir.1990). Accordingly, her land is taxable by Franklin County.

**2.** The *Cass County* opinion suggests this very result:

> The Leech Lake Band and the United States, as *amicus*, also argue that the parcels at issue here are not alienable—and therefore not taxable—under the terms of the Indian Nonintercourse Act....
> Because the parcels at issue here are not alienable—and therefore not taxable—under the terms of the Indian Nonintercourse Act, which provides: "No taxation if it remains freely alienable", and because it was not addressed by the Court of Appeals, we decline to consider it for the first time in this Court.

524 U.S. at 115 n. 5, 118 S.Ct. 1904. Given that Justice Thomas, writing for a unanimous Court, had just implied that INA alienability equals taxability, the sentence in quotations remains at least anomalous.

**3.** Nor is *Solem v. Bartlett*, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984). There, the Court held that "[o]nce a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." 465 U.S. at 470, 104 S.Ct. 1161. Our holding is simply that, consistent with *Goudy* and *Cass County*, compliance with the INA is such a congressional "indication."

WINTER, Circuit Judge, concurring.

I concur in affirming the judgment, but for very different reasons from those expressed by Judge Van Graafeiland. For the sake of brevity, the text of my opinion is largely confined to the statement of my position, and the recitation of points on which I agree or disagree with my colleagues is left to footnotes.

The principal question argued by the parties is whether, through a series of treaties with the State of New York in the first two decades of the Nineteenth Century (hereinafter "the Conveyances"), the St. Regis Tribe validly ceded portions of its Reservation. Each party to this litigation, for its own reasons, assumes that appellant has valid title to the land in question. Appellant does so for self-evident reasons. Appellees in turn cannot question appellant's title without questioning the title of all the current owners of land purportedly transferred by the Conveyances. My colleagues treat this entirely self-serving agreement as binding on us and thereafter pursue very different lines of reasoning as to its consequences on this appeal.[1] Such an agreement, concerning a matter of law hotly disputed in separate litigation, *see Canadian St. Regis Band of Mohawk Indians v. State of New York*, 146 F.Supp.2d 170, 173–74 (N.D.N.Y.2001), is not binding upon us. *See United States Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) ("[T]he Court of Appeals acted without any impropriety in refusing to accept what in effect was a stipulation to a question of law."); *Swift & Co. v. Hocking*

*Valley Ry. Co.*, 243 U.S. 281, 289, 37 S.Ct. 287, 61 L.Ed. 722 (1917) ("If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law. If the stipulation is to be treated as an attempt to agree 'for the purpose only of reviewing the judgment' below that what are the facts shall be assumed not to be facts, a moot or fictitious case is presented." (footnote omitted)); *cf. Barr v. Matteo*, 355 U.S. 171, 172, 78 S.Ct. 204, 2 L.Ed.2d 179 (1957) ("[A]n advisory opinion cannot be extracted from a federal court by agreement of the parties."); *Weston v. Wash. Metro. Area Transit Auth.*, 78 F.3d 682, 685 (D.C.Cir.1996) (refusing to decide a "hypothetical case" framed by parties' stipulations to legal conclusions).

In my view, the dispute over the validity of the Conveyances is irrelevant to the outcome of this litigation. Briefly stated, if the Conveyances were invalid, then appellant does not have lawful title to the land and has no standing to challenge the *ad valorem* tax. But even if the Conveyances were sufficient to support appellant's claim of title, the land is subject to taxation whether or not it is still within the Reservation. I would affirm without addressing the validity of the Conveyances.

## BACKGROUND

In 1791, the State of New York sold a large area of land along the St. Lawrence River to Alexander Macomb. The con-

---

1. Judge Van Graafeiland relies upon the parties' agreement as to the validity of appellant's title to conclude that the land in question must have been validly conveyed in accordance with the Nonintercourse Act. *See ante* at 83 (Van Graafeiland, J.). Judge Sack relies upon the agreement of the parties as to the validity of appellant's title as a

reason not to question [it] *sua sponte, post* at 88 (Sack, J., dissenting), thereby enabling him to assume that appellant's property is freely alienable while ignoring the logical consequences of his detailed and forceful argument regarding the invalidity of the Conveyances.

tract memorializing this sale allowed the State to retain "a tract equal to six miles square, in the vicinity of the Village of St. Regis" as long as that tract was "applied for the use of the Indians" living there. In 1796, with the consent of the federal government, the State entered into a treaty with the Seven Nations of Canada that established that the six miles square tract of land would be dedicated as reservation territory.

Beginning in 1816, the Tribe and the State entered into the Conveyances, a series of treaties pursuant to which the Tribe sold parcels of land located within the Reservation boundaries to the State. Appellant's property is part of the territory that was sold to the State in 1824 and 1825. Since then, that land has been treated without exception as a large number of privately owned, fee-simple estates. For example, the property in question has been repeatedly purchased and sold by multiple private parties during the past 180 years, until appellant's husband sold it to her. It has also been subject to an *ad valorem* tax since at least 1872.

## DISCUSSION

Appellant's central claim on appeal is that her property is immune from taxation by the County of Franklin because, although she has title to the land, it is, notwithstanding the Conveyances, still within the St. Regis Reservation and under tribal jurisdiction. In arguing that she owns the land but that the land is still within the Reservation, she relies upon the concept that has come to be known as "decoupling," i.e. title to land may be pri-

vately owned while the land remains within tribal jurisdiction. In particular, she relies upon *Solem v. Bartlett*, which stated,

> [O]nly Congress can divest a reservation of its land and diminish its boundaries. Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.

465 U.S. 463, 470, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984). Because Congress established the Tribe's Reservation in 1796 and has, in appellant's view, never purported to diminish it, appellant argues that her property must be still within "Indian country" and that it is therefore nontaxable.[2]

Appellant's argument contains two fatal flaws. The first flaw is that appellant conceives of decoupling as a doctrine allowing title to all land in Indian reservations to be freely alienable without congressional authority, while reservation boundaries can be altered only with such authority. In her view, therefore, she need not trace her title to an Act of Congress allowing the Tribe to convey the land. However, decoupling occurs only when Congress expressly allows title to land within reservations to be conveyed but fails to authorize a corresponding shrinkage of the particular reservation.[3] In other words, as with changes in the boundaries of a reservation, reservation land can become alienable—can become plots of privately owned property—only upon federal authority. *See Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543, 604, 5 L.Ed. 681 (1823) (refusing to recognize

---

**2.** There are other necessary steps in appellant's argument leading to her conclusion—for example, her status as a member of the Tribe—that I need not, and do not, discuss in light of the disposition I favor.

**3.** I therefore disagree with Judge Sack's view that there is no "act" of decoupling. *See post* at 90 (Sack, J., dissenting). Decoupling occurs only when Congress "acts" to authorize the passage of title without also permitting the shrinking of tribal jurisdiction.

land titles originating in grants by Indians to private parties); *Penobscot Indian Nation v. Key Bank of Maine*, 112 F.3d 538, 548–49 (1st Cir.1997) (noting that "Indian tribes enjoyed the right to possess and occupy lands but not to alienate these lands without the federal government's approval"); *Catawba Indian Tribe of S.C. v. South Carolina*, 865 F.2d 1444, 1448 (4th Cir.1989) ("Indian title cannot be alienated except by Act of Congress; a purported conveyance of the possessory right, even if made by a tribe having such title, is void and no title passes.").

Given her view of decoupling, appellant is content to trace her title solely to the Conveyances, which purported to convey all tribal rights to the land but which appellant views as sufficient only to convey title[4] but not jurisdiction. However, as explained above, congressional authority is needed to convey either title or jurisdiction, or both, and her attack on the validity of the Conveyances states that Congress never authorized them to any degree. If that attack were to prevail, therefore, it would be sufficient to defeat the transfer of title as well as jurisdiction.

The second flaw is equally fatal to appellant's claim. Congress need not shrink the jurisdictional boundaries of a tribal reservation in order to render plots of land within such boundaries taxable by the

state. Rather, to render Indian land taxable, Congress need only have "made its intention to do so unmistakably clear," *Cass County, Minn. v. Leech Lake Band of Chippewa Indians*, 524 U.S. 103, 110, 118 S.Ct. 1904, 141 L.Ed.2d 90 (1998) (quoting *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, 502 U.S. 251, 258, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992)), and such an "unmistakably clear" intention will be inferred where Congress has authorized the alienability of the land in question. *See id.* at 110–11, 118 S.Ct. 1904 ("We have determined that Congress has manifested such an intent [to authorize taxation of land on an Indian reservation] when it has authorized reservation lands to be allotted in fee to individual Indians, thus making the lands freely alienable and withdrawing them from federal protection."). In other words, for a plot of reservation land to pass to individual ownership, Congress must authorize the conveyance and that very authorization serves to authorize taxation.[5]

Therefore, there is a complete factual and legal overlap of the individual title, tribal jurisdiction, and taxability issues. If appellant succeeds in establishing that there was no congressional authorization for the Conveyances, her title is destroyed, and she has no standing to challenge the

---

4. Appellant's counsel stipulated at oral argument that "her chain of title depends upon the validity of [the Conveyances]."

5. In *Thompson v. County of Franklin* (*Thompson I*), we reviewed a dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6), and therefore assumed the allegations to be true. 15 F.3d 245, 249 (2d Cir. 1994). One of those allegations was that appellant held title to the land in question. Without reaching any of the merits, including the validity of appellant's title, we held that, if there had been a valid decoupling of title and jurisdiction, appellant, like any titleholder of

land, had standing to challenge a property tax. *See id.* at 252–53. *Thompson I* does not control the outcome here for two reasons.

First, the procedural posture has now changed, and we can no longer assume appellant's allegations regarding title to be true. Further, as explained in the text, it is now clear that she cannot substantiate her allegations that her title and tribal jurisdiction have been validly decoupled. Second, *Thompson I* was decided before *Cass County*, which makes it clear that even if appellant held valid, decoupled title and the land were within the Reservation, it would still be taxable.

tax.[6] *See Thompson I*, 15 F.3d at 249. But even if she were somehow able to establish congressional action (she doesn't claim to do so), leaving her with valid title and the Tribe with jurisdiction over the land, she would still lose this litigation because whatever congressional authorization allowed the sale of the individual tracts would have also rendered the land taxable.[7]

Appellant cannot, therefore, win this case. There are only three possible outcomes: (i) there was congressional authorization for, or ratification of, the Conveyances sufficient to transfer title and alter the Reservation boundaries (jurisdiction) in a corresponding fashion; as a result, appellant has title to the land but it is taxable by the County of Franklin; (ii) somehow, Congress authorized the Conveyances to pass title but not shrink the Reservation boundaries; if so, the land is taxable under *Cass County*, 524 U.S. at 110–11, 118 S.Ct. 1904; or (iii) the Conveyances were not authorized by Congress to pass title or alter the Reservation boundaries, and, as noted in *Thompson I*, only the Tribe has standing to challenge the property tax. *Thompson I*, 15 F.3d at 249. The judgment must, therefore, on any theory, be affirmed.[8]

In my view, we neither need to nor should resolve the debated issues regarding the validity of the Conveyances. We need not resolve them because they do not affect the outcome of this litigation, as explained above. We should not resolve them because the validity of the Conveyances affects the title of numerous other landowners and the Tribe itself, *see Canadian St. Regis Band of Mohawk Indians*, 146 F.Supp.2d at 173–74, and should not be determined in litigation in which the stake of these parties in the outcome is obscured. If we were to hold that appellant lacks title, the decision would, as precedent, affect all the present owners whose title is traceable to the Conveyances. Were we to hold that appellant has title, the decision would as precedent prevent the Tribe from asserting title. This is not the occasion to do either.

I therefore concur in affirming the judgment of the district court.

6. Judge Sack's dissenting opinion avoids this conclusion by assuming the validity of appellant's title, even though his opinion states that title could pass from the Tribe only with congressional authorization, *see post* at 90 (Sack, J., dissenting), and that the Conveyances, upon which appellant relies for title, *see* note 4, *supra*, were not congressionally authorized, *see post* at 92 (Sack, J., dissenting).

7. Judge Sack's dissenting opinion concludes that *Cass County* is irrelevant because the actions that rendered appellant's property alienable lacked congressional authority. *See post* at 95 (Sack, J., dissenting). In his view, the issue thus becomes "not whether ... the land is freely alienable, but whether it is freely alienable by Act of Congress." *Id.* However, this distinction does not exist in Indian law because, as his opinion states, *see post* at 90 (Sack, J., dissenting), there is no category of alienable Indian lands absent congressional authorization. To hold otherwise would subvert the protective regime Congress established at the beginning of the Republic. Therefore, if appellant's land is alienable, then it must have received congressional approval pursuant to 25 U.S.C. 177, and either it is not within tribal jurisdiction or *Cass County* controls. In either case, appellant's land is taxable.

8. Judge Sack quibbles with this conclusion on the ground that outcome (iii) would require either a dismissal of the appeal or a remand with instructions to dismiss the complaint. *See post* at 89 n. 4 (Sack, J., dissenting). In my view, a dismissal would not be appropriate because we clearly have appellate jurisdiction. A remand would be unnecessary because the district court already has dismissed the complaint; an affirmance is therefore all that is necessary.

SACK, Circuit Judge, dissenting.

The law presently exempts from municipal taxation Indian-owned land located in "Indian country," as defined in 18 U.S.C. § 1151, absent a clear congressional intent to the contrary. *Okla. Tax Comm'n v. Chickasaw Nation,* 515 U.S. 450, 458, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995); *Okla. Tax Comm'n v. Sac & Fox Nation,* 508 U.S. 114, 128, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993). Because I conclude that (1) Thompson's property remains within the jurisdiction of the St. Regis Band of ·Mohawk Indians' Reservation (the "Reservation"), and hence within "Indian country," 18 U.S.C. § 1151; (2) Congress has not, expressly or implicitly, made its intent to diminish the Reservation or subject Indian-owned land within its jurisdiction to state taxation unmistakably clear; and (3) notwithstanding her purported letter of resignation, Thompson may well remain a member of the St. Regis Band of Mohawk Indians (the "St. Regis Tribe"), and hence an Indian, I would reverse, perhaps with a remand to the district court for further findings of fact on the last issue. I respectfully dissent.

## I.[1]

I emphasize at the outset my agreement with Judge Winter's view, *ante* at 87, that

we need not and should not decide the validity of the transfer of title to real property by the series of land conveyances concluded ·in the early 1800s between the State of New York and the St. Regis Tribe (the "1816 Conveyances"). Neither party questions either the validity of Thompson's title to her land, *ante* at 84, or that it is freely alienable, *ante* at 82; *see also Thompson III,* 987 F.Supp. at 116 n. 16. Indeed, Thompson informs us that the validity of the 1816 Conveyances to which she concededly traces her title—and to which the State traces its title to other tracts of land within the jurisdiction of the Reservation—"is the subject of other litigation." Appellant's Br. at 5. Throughout this action, however, she has consistently maintained that "the validity or invalidity of these conveyances is simply beside the point." *Id.* at 5 n. 3; *see also Thompson I,* 15 F.3d at 250 ("[T]he complaint alleges that the 1816 Conveyance Agreements go only to the issue of *title* to land located *within* the boundaries of the St. Regis Reservation, not the issue of the boundaries themselves.") (emphasis in original).[2]

I agree. As we said in *Thompson I,* albeit in the context of a motion to dismiss for want of standing where we assumed the plaintiff's factual allegations to be true,[3] Thompson's claim to exemption from

---

1. For ease of reference, I have cataloged the previous decisions in this litigation, some of which are referred to below, as: *Thompson v. County of Franklin,* 127 F.Supp.2d 145 (N.D.N.Y.2000) (*"Thompson V "*); 180 F.R.D. 216 (N.D.N.Y.1998) (*"Thompson IV "*); 987 F.Supp. 111 (N.D.N.Y.1997) (*"Thompson III "*); No. 92–CV–1258, 1996 WL 341988, 1996 U.S. Dist. LEXIS 8647 (N.D.N.Y. June 18, 1996) (*"Thompson II "*); and 15 F.3d 245 (2d Cir.1994) (*"Thompson I "*), *rev'g* No. 92–CV–1258, 1992 WL 554369, 1992 U.S.Dist. LEXIS 18109 (N.D.N.Y. Nov. 30, 1992).

2. At oral argument, Thompson's counsel explained: "Our position is that without regard to the validity of those 1816 transactions Mrs.

Thompson's property nonetheless remains in Indian Country. At most, the only thing that happened in those 1816 transactions was an extinguishment of the Tribe's title. The Supreme Court has made it very clear ... that the title inquiry is wholly independent of the jurisdictional inquiry." Tr. of Oral Argument at 8–9.

3. Thompson's complaint alleges that the 1816 Conveyances did not diminish the jurisdiction of the Reservation. *See* Compl. ¶¶ 10–12. In *Thompson I,* we observed that "the mere conveyance of reservation property to non-Indians does not necessarily disestablish the reservation boundaries for jurisdictional purposes," 15 F.3d at 250, and for

the County's *ad valorem* tax does not depend on the validity of her "title," 15 F.3d at 250–51, which neither party disputes and I see no reason to question *sua sponte.* It depends on the conceptually distinct question of "jurisdiction" which we described as the "ultimate issue in this case—whether the 1816 Conveyance Agreements altered the boundaries of the St. Regis Reservation and thereby removed [Thompson's property] from Indian country." *Id.* at 251. Has Congress, expressly or implicitly, manifested a clear intent to diminish the Reservation's jurisdiction or to subject Indian-owned land within that jurisdiction to state and local taxation? [4]

## II.

The principle that jurisdiction and title do not presumptively travel together is admittedly counterintuitive. But the explanation for this apparent anomaly emerges from a review of the history of what Congress now defines as "Indian country." 18 U.S.C. § 1151.

Congress originally limited "Indian country" to tracts of land to which the tribes or their members retained title. *See Clairmont v. United States,* 225 U.S. 551, 557, 32 S.Ct. 787, 56 L.Ed. 1201 (1912) (quoting Act of June 30, 1834, ch. 161, 4 Stat. 729 (codifying the definition of "Indian country," which then *excluded* land to which Indian title had been extinguished)); *see also id.* at 558, 32 S.Ct. 787 ("[Indian lands] ... continued to be Indian country so long as the Indians had title to it, and no longer. As soon as they parted with the title, it ceased to be Indian country, without any further act of Congress ....") (quoting *Bates v. Clark,* 95 U.S. 204, 207–208, 24 L.Ed. 471 (1877)); *accord United States v. Chavez,* 290 U.S. 357, 364, 54 S.Ct. 217, 78 L.Ed. 360 (1933) ( "[T]he term 'Indian country' was intended to include any *unceded* lands owned or occupied by an Indian nation or tribe or Indians.") (emphasis added).

"In 1948, however, with the enactment of the statutory definition of Indian country, 'Congress uncouple[d] reservation status from Indian ownership and statutorily

---

this reason, we faulted the district court for dismissing Thompson's complaint based "on a contrary premise: that the 1816 Conveyance Agreements ... automatically uncoupled that land from the boundaries of the Reservation as originally established by the Treaty of 1796," *id.* at 251. We further noted that "there is nothing in the record before us at this stage in the proceedings to support a finding by the district court that ['the 1816 Conveyance Agreements altered the boundaries of the St. Regis Reservation']." *Id.* We therefore placed the burden on the party alleging a diminishment (not "a decoupling")—that is, the County—to introduce evidence of congressional intent to diminish the Reservation. So far as I can tell, it has failed to meet that evidentiary burden.

4. I am somewhat puzzled by Judge Winter's conclusion that

[t]here are only three possible outcomes: (i) there was congressional authorization for, or ratification of, the Conveyances sufficient to transfer title and alter the Reservation boundaries (jurisdiction) in a corresponding fashion; as a result, appellant has title to the land but it is taxable by the County of Franklin; (ii) somehow, Congress authorized the Conveyance to pass title under *Cass County,* 524 U.S. at 110–11, 118 S.Ct. 1904; or (iii) the Conveyances were not authorized by Congress to pass title or alter the Reservation boundaries, and, as noted in *Thompson I,* only the Tribe has standing to challenge the property tax. *Thompson I,* 15 F.3d at 249. *The judgment must, therefore, on any theory, be affirmed.*

*Ante* at 87 (emphasis supplied). I would have thought that with respect to outcomes (i) and (ii), we would affirm; but with respect to outcome (iii) we would either dismiss the appeal or remand for the district, court to dismiss the complaint for want of standing.

define[d] Indian country to include lands held in fee by non-Indians *within* reservation boundaries.'" *Thompson I*, 15 F.3d at 250 (quoting *Solem v. Bartlett*, 465 U.S. 463, 468, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984)) (alterations and emphasis in original). "Uncoupling" or "decoupling" is thus not, as a general matter, something Congress needs expressly to elect to do or not to do on each occasion that it acts in a manner that affects Indian lands. Decoupling, rather, describes a definitional feature of "Indian country," the scope of which Congress changed in 1948. Title 18 U.S.C. § 1151, enacted in that year, provides that "Indian country" means:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

*Id.*[5] It seems clear that "all land within the limits of any Indian reservation" cannot mean, as the majority appears to suggest, "all land within the limits of any Indian reservation *owned or administered by the Indian tribe.*" A leading treatise explains that "[t]he most important effect of the terms ['all land' and 'notwithstanding the issuance of any patent' in the definition of reservation was] to resolve several problems generated by the prior law regarding unrestricted fee simple lands within reservation boundaries, which had tied Indian

country status to Indian land title." Felix S. Cohen, *Handbook of Federal Indian Law* 35 (1982 ed.). In other words, after 1948, by dint of 18 U.S.C. § 1151(a), "Indian country" status is *not* presumptively tied to Indian ownership, land title or administration.

I do not dispute that congressional authority must exist to effect a valid cession of either title or jurisdiction. But I am aware of no authority—and the majority cites none—to support the proposition that there is some act, "a decoupling," that Congress expressly elects to do from time to time. To the contrary, Congress's 1948 redefinition of "Indian country," which made clear that title and jurisdiction generally should not be presumed coextensive, decoupled jurisdiction and title in the absence of evidence that Congress clearly intended to diminish a reservation's jurisdiction. After 1948, that is, the extinguishment of title alone should no longer be presumed to disestablish the "jurisdictional" boundaries of a reservation.

Thus, in *Solem v. Bartlett*, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), which my colleagues find inapposite for different reasons, *ante* at 83 n. 3; 85, the Supreme Court considered whether the Cheyenne River Act of 1908, 35 Stat. 460 *et seq.*, which "authorized the Secretary of the Interior to open 1.6 million acres of the Cheyenne River Sioux Reservation for homesteading," *Solem*, 465 U.S. at 464, 104 S.Ct. 1161, implicitly diminished the jurisdictional boundaries of that reservation, *see id.* The Court held that it did not, explaining that "[o]nce a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Con-

---

**5.** This definition, while codified in the context of federal criminal jurisdiction, applies equally to questions of civil jurisdiction. *DeCoteau*

*v. Dist. County Court for the Tenth Judicial Dist.*, 420 U.S. 425, 427 n. 2, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975).

gress explicitly indicates otherwise." *Id.* at 470, 104 S.Ct. 1161. Congress, the Court concluded, had not explicitly indicated any such intent to diminish the jurisdictional boundaries.

The *Solem* Court further explained that the surplus land Acts themselves seldom detail[ed] whether opened lands retained reservation status or were divested of all Indian interests. When the surplus land Acts were passed, the distinction seemed unimportant. The notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar at the turn of the century.... Only in 1948 did Congress uncouple reservation status from Indian ownership, and statutorily define Indian country to include lands held in fee by non-Indians within reservation boundaries....

Although the Congresses that passed the surplus land Acts anticipated the imminent demise of the reservation and, in fact, passed the Acts partially to facilitate the process, *we have never been willing to extrapolate from this expectation a specific congressional purpose of diminishing reservations with the passage of every surplus land Act.*

*Id.* at 468–69, 104 S.Ct. 1161 (internal citations omitted; emphasis added); *see also South Dakota v. Yankton Sioux Tribe,* 522 U.S. 329, 343–44, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998). *Solem* therefore makes clear, first, that by its redefinition of "Indian country," Congress did decouple "reservation status" (i.e., tribal "jurisdiction") from "Indian ownership" (i.e., "title"); and second, that the new definition should be applied retroactively to assess the effect of acts that precede it. In *Solem* itself, the Court thus applied Congress's 1948 redefinition of "Indian country" retroactively to find that Congress had not diminished a reservation by a particular 1908 surplus-land act authorizing conveyance of title, even though, at that time, the concept of conveying title without concurrently diminishing a reservation's jurisdiction remained unknown.

Here, similarly, the relevant inquiry should be whether the record discloses a clear congressional intent to diminish or disestablish the jurisdictional boundaries of the St. Regis Reservation so that it does not include the land to which Thompson claims title, because "only Congress can alter the terms of an Indian treaty by diminishing a reservation, and its intent to do so must be 'clear and plain.'" *Yankton Sioux Tribe,* 522 U.S. at 343, 118 S.Ct. 789 (citation omitted; quoting *United States v. Dion,* 476 U.S. 734, 738–39, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986)).

### III.

"Our touchstone to determine whether a given statute diminished or retained reservation boundaries is congressional purpose." *Yankton Sioux Tribe,* 522 U.S. at 343, 118 S.Ct. 789. In making this inquiry, "we resolve any ambiguities in favor of the Indians, and we will not lightly find diminishment." *Yankton Sioux Tribe,* 522 U.S. at 344, 118 S.Ct. 789; *accord Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985) (emphasizing that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit"); *see also County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 247, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (restating the canons of construction applicable to question of federal Indian law; collecting cases).

In 1796, the State concluded a treaty with, among other Indian nations, the St.

Regis Tribe.[6] *See* Treaty with the Seven Nations of Canada, May 31, 1796, 7 Stat. 55 (the "1796 Treaty"). The Tribe relinquished all "claim, right, or title" to its lands located in New York with the exception of a "tract equal to six miles square ... to be applied to the use of the Indians of the village of St. Regis, [which] shall still remain so reserved." *Id.* Because the Constitution vests exclusive authority over relations with the Indian nations in the federal government, *see Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 560, 8 L.Ed. 483 (1832), the State could not and did not enter into the 1796 Treaty on its own authority. Abraham Ogden, a "Commissioner appointed under the Authority of the United States," 1796 Treaty, pmbl., approved the Treaty, and on January 31, 1797, President Washington formally proclaimed it. *Thompson III*, 987 F.Supp. at 114.

Although the treaty by which the Tribe relinquished title to its lands was proclaimed by the President, insofar as the record indicates and we are aware, *Congress* has never acted, either expressly or implicitly, to diminish the Reservation's jurisdiction. Whatever the 1816 Conveyances did or did not accomplish with regard to the cession of title—again, an issue that I see no reason to address here—the parties to this litigation have furnished us with no evidence or indicium of any congressional intent, still less a clear one, to diminish the jurisdictional boundaries of the Reservation established by the 1796 Treaty. *See Thompson I*, 15 F.3d at 250 n. 4 ("Congress must clearly evince the intent to reduce boundaries, *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 615, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), and traditional solicitude for Indian rights favors the survival of reservation boundaries in the face of the opening up of reservation lands to settlement and entry by non-Indians. *Solem*, 465 U.S. at 472, 104 S.Ct. 1161.").

Judge Van Graafeiland finds that the 1816 Conveyances, by their alleged compliance with the Indian Non Intercourse Act, manifested the requisite clear intent to diminish. *Ante* at 82–83, 83 n. 3. But the district court found no indicium of congressional authority specifically for the 1816 Conveyances, *Thompson III*, 987 F.Supp. at 122; *a fortiori* the 1816 Conveyances do not evince a *clear* congressional intent to diminish the Reservation. *See Yankton Sioux Tribe*, 522 U.S. at 343, 118 S.Ct. 789; *Solem*, 465 U.S. at 470, 104 S.Ct. 1161. I also doubt the proposition that "the parties' concession" that Thompson's land is freely alienable necessarily "operates as a stipulation that the conveyances leading to [her] title necessarily complied with that Act [i.e., the Indian Non Intercourse Act]." *Ante* at 83. First, I agree with Judge Winter's view that "[w]e should not resolve [the validity of the Conveyances] because [they] affect[ ] the title of numerous other landowners and the [St. Regis Tribe itself] and should not be determined in litigation in which the stake of these parties in the outcome is obscured." *Ante* at 87. But even assuming that the parties' concession suffices to operate as a "stipulation" that the 1816 Conveyances validly ceded *title* pursuant to the Indian Non Intercourse Act, it does not follow that this stipulation retroactively creates a clear congressional intent to diminish the jurisdiction of a reservation established by a valid federal treaty. *See* Cohen, *supra*, at 63 ("Treaties with Indian tribes are accorded the same dignity as that given to treaties with for-

---

**6.** The St. Regis Band of Mohawk Indians is a federally recognized Indian tribe. *See* 67 Fed.Reg. 46328–46330 (July 12, 2002).

eign nations.") (citing *United States v. 43 Gallons of Whiskey,* 93 U.S. 188, 197, 23 L.Ed. 846 (1876)); *Oneida Indian Nation,* 470 U.S. at 247, 105 S.Ct. 1245 ("Absent explicit statutory language, this Court … has refused to find that Congress has abrogated Indian treaty rights.") (citations and internal quotation marks omitted).

In *Thompson I,* we said that "whether this presumption [against a finding of diminishment of] reservation boundaries applies in the context of a conveyance of reservation property from the tribe to a sovereign state … rather than in the context of the opening up of Indian lands by the federal government to homesteading by private, non-Indian settlers … is an issue to be decided first in the district court." 15 F.3d at 250 n. 4. The district court, following this instruction, expressed "reluctan[ce]" to apply the test set forth in *Solem,* see 465 U.S. at 470–71, 104 S.Ct. 1161, for determining whether a particular surplus-land act diminished reservation jurisdiction, because "the surplus land act factors are not readily adaptable to a reservation diminishment claim based upon conveyance agreements." *Thompson III,* 987 F.Supp. at 123. Absent alternative guidance, however, the court applied the *Solem* test and found that the 1816 Conveyances diminished the reservation. *See id.* at 125. In my view, the court erred by applying this analytical framework. I agree with Judge Hurd that the *Solem* factors for analyzing the effect of particular surplus-land acts, including inquiry into the "surrounding circumstances" and "subsequent treatment" of Indian lands, become "relevant only where needed to determine congressional intent. Where, as here, there is no congressional act, congressional intent is irrelevant and the subsequent treatment and the pattern of settlement are also

irrelevant." *Oneida Indian Nation v. City of Sherrill,* 145 F.Supp.2d 226, 247–48 (N.D.N.Y.2001).

In sum, the 1796 Treaty created the St. Regis Tribe's Reservation. The County furnished no evidence indicating a clear congressional intent to diminish the Reservation's jurisdiction. To the extent that ambiguities incident to the 1816 Conveyances exist, canons of construction applied to questions of federal Indian law require that we resolve them in favor of the Indians and against a finding of diminishment. *See Oneida Indian Nation,* 470 U.S. at 247, 105 S.Ct. 1245 (collecting cases). I would conclude that the jurisdiction of the St. Regis Reservation over the real property in question remains intact.

## IV.

States and municipalities ordinarily lack the power to levy taxes on Indian-owned land located in "Indian country." *See Chickasaw Nation,* 515 U.S. at 458, 115 S.Ct. 2214. This rule does not apply, however, if Congress has made its intention to subject Indian lands to state and local taxation "unmistakably clear." *Yakima,* 502 U.S. at 258, 112 S.Ct. 683. For this reason, my colleagues cite *Cass County v. Leech Lake Band of Chippewa Indians,* 524 U.S. 103, 118 S.Ct. 1904, 141 L.Ed.2d 90 (1998), as an alternative basis for their conclusion that Thompson's claim fails. *See ante* at 82; 86. In *Cass County,* the Court held that "when Congress makes reservation lands freely alienable, it is 'unmistakably clear' that Congress intends that land to be taxable by state and local governments unless a contrary intent is 'clearly manifested.'" 524 U.S. at 113, 118 S.Ct. 1904 (citations omitted).

The parties do not dispute that Thompson's property is freely alienable. But reliance on *Cass County* to establish that it

therefore must also be taxable is misplaced. *Cass County* did not hold, as the County avers, that "if [Indian land] is freely alienable, it is subject to taxation regardless of whether or not it is Indian country." Appellee's Br. at 9. Nor, in my view, did "*Cass County* . . . make[ ] it clear that even if [Thompson] held valid, decoupled title and the land were within the Reservation, it would still be taxable." *Ante* at 87 n 6. In *Cass County*, the Court said only that where *Congress* renders Indian lands freely alienable, it manifests the requisite "unmistakably clear" intent to subject those lands to taxation. *See* 524 U.S. at 110–11, 118 S.Ct. 1904. It did not say that so long as particular Indian lands are—or historically have been treated as—alienable, those lands must perforce be taxable.

Two decisions prior to *Cass County* inform its holding. In *Goudy v. Meath*, 203 U.S. 146, 27 S.Ct. 48, 51 L.Ed. 130 (1906), the Court concluded that under an 1854 treaty allotting lands to individual members of the Puyallup Indian Nation, Congress clearly manifested its intent to subject those lands to taxation. The Court observed that while "Congress may grant the power of voluntary sale while withholding the land from taxation or forced alienation," "it would seem strange to . . . permit the Indian to dispose of his lands as he pleases, while at the same time releasing it from taxation." *Id.* at 149, 27 S.Ct. 48. In *County of Yakima v. Confederated Tribes*

*and Bands of Yakima Indian Nation*, 502 U.S. 251, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992), the Court held that the General Allotment Act, by allotting lands in fee to individual Indians, rendering them alienable, and expressly authorizing the "taxation of . . . land," manifested a clear congressional intent to subject those lands to an *ad valorem* tax. *Id.* at 264–65, 269–70, 112 S.Ct. 683. At the same time, the Court reaffirmed (1) that "'[a]bsent cession of jurisdiction or other federal statutes permitting it,' . . . a State is without power to tax reservation lands and reservation Indians," *id.* at 258, 112 S.Ct. 683 (quoting *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973)); and (2) that the Court will not "find that Congress has authorized state taxation unless it has 'made its intention to do so unmistakably clear,'" *id.* (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 765, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985)).

In *Cass County*, finally, the Court construed *Yakima* to make clear that its holding did not depend on the General Allotment Act specifically.[7] Rather, "*Yakima*, like *Goudy*, stands for the proposition that when Congress makes reservation lands freely alienable, it is 'unmistakably clear' that Congress intends that land to be taxable by state and local governments unless a contrary intent is 'clearly manifested.'" *Cass County*, 524 U.S. at 113, 118 S.Ct. 1904 (citations omitted).

---

**7.** This conclusion remains in some tension with the language in *Yakima*. The *Yakima* Court applied the canon of construction counseling the resolution of ambiguous statutory provisions in favor of the Indians to the General Allotment Act and found that the Act "permits Yakima County to impose an ad valorem tax on reservation land patented in fee pursuant to the Act, but does not allow the county to enforce its excise tax on sales of such land." *Yakima*, 502 U.S. at 270, 112 S.Ct. 683; *see also id.* at 269, 112 S.Ct. 683

("The short of the matter is that the General Allotment Act explicitly authorizes only 'taxation of . . . land,' not 'taxation with respect to land,' 'taxation of transactions involving land,' or 'taxation based on the value of land.'"). In *Cass County*, however, the Court appears to have retreated from any reliance on the language of the General Allotment Act because it faulted the Eighth Circuit for construing *Yakima* as dependent on the Act's "express reference to taxability." *Cass County*, 524 U.S. at 113, 118 S.Ct. 1904.

These cases, in my judgment, establish that when *Congress* decides to make certain lands within "Indian country" freely alienable or authorizes Indians to transfer tribal lands in fee simple—as it did under the General Allotment Act—it manifests the requisite "unmistakably clear" intent to subject those lands to state and municipal taxation. Thus, if Thompson's land, like that at issue in *Goudy, Yakima,* and *Cass County,* had been rendered alienable *by Congress,* it would be subject to state and municipal taxation, at least in the absence of a clear congressional intent to the contrary. *See Cass County,* 524 U.S. at 112, 118 S.Ct. 1904; *Goudy,* 203 U.S. at 149, 27 S.Ct. 48. But so far as the record (or anything else of which I am aware) indicates, acts that rendered the property here in question alienable lack indicia of congressional authority. *Thompson III,* 987 F.Supp. at 122.

Judge Van Graafeiland points to the Court's reasoning in *Goudy* to support his position that the Indian Non–Intercourse Act provides the requisite "unmistakably clear" intent. *See ante* at 82. While I entirely agree that "it would seem strange" to allow Thompson "to dispose of [her] lands as [s]he pleases, while at the same time releasing [her] from taxation," *Goudy,* 203 U.S. at 149, 27 S.Ct. 48, it would strike me as "strange," too, to permit the 1816 Conveyances, transactions that lack indicia of congressional authority, *Thompson III,* 987 F.Supp. at 122, to supply the "unmistakably clear" congressional intent required to authorize state and local taxation of Indian-owned lands within "Indian country." In *Goudy,* a federal treaty provided indicia of that intent, *see* 203 U.S. at 146, 27 S.Ct. 48; in *Yakima,* the General Allotment Act did, *see* 502 U.S. at 270, 112 S.Ct. 683; and in *Cass County,* the Nelson Act did, *see* 524 U.S. at 108, 113, 118 S.Ct. 1904. The record here, by con-trast, reveals no comparable act or "unmistakably clear" congressional intent.

Thus, the issue seems to me not whether Thompson's land is freely alienable, but whether it is freely alienable because of an act of Congress. After the 1796 Treaty, Congress never, expressly or implicitly, modified or otherwise acted to diminish the jurisdiction of the Reservation. No statute allotted or rendered alienable the lands within that jurisdiction. Nor does the record disclose any other potential "unmistakably clear" congressional intent that may have made the Reservation's lands alienable. Absent some evidence of such congressional intent, I would apply the contrary presumption articulated by the Court in *Chickasaw Nation:*

> [W]hen a State attempts to levy a tax directly on an Indian tribe or its members inside Indian country, rather than on non-Indians, we have employed, instead of a balancing inquiry, "a more categorical approach: 'Absent cession of jurisdiction or other federal statutes permitting it,' we have held, a State is without power to tax reservation lands and reservation Indians."

515 U.S. 450, 458, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995) (quoting *Yakima,* 502 U.S. at 258, 112 S.Ct. 683) (quoting *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973)); *Sac & Fox Nation,* 508 U.S. 114, 128, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993) ("Absent explicit congressional direction to the contrary, we presume against a State's having the jurisdiction to tax within Indian country, whether the particular territory consists of a formal or informal reservation, allotted lands, or dependent Indian communities.)"; *see also* Laurence H. Tribe, *American Constitutional Law* 1220–21 n. 2, 1227 n. 6 (3d ed. Vol. 1 2000) (collecting

cases).[8]

## V.

Because my colleagues resolve this case based on the status of Thompson's land, they need not and do not address the status of Thompson—whether she remains a member of the St. Regis Tribe notwithstanding her purported letter of resignation. *See ante* at 81; 85 n. 2. Thompson does not dispute that if she is not a tribal member, the County can tax her land. *Thompson IV*, 180 F.R.D. at 225; *see, e.g., Chickasaw Nation*, 515 U.S. at 459, 115 S.Ct. 2214. The district court held that "Thompson had the right, which clearly she exercised when she submitted her June 27, 1997 retraction letter, to sever her relationship with the St. Regis Mohawk Tribe." *Thompson IV*, 180 F.R.D. at 225; *see also ante* at 81 (quoting Thompson's resignation letter).

But Thompson argues, and I would agree, that we lack authority to assess her tribal membership because tribal membership is generally a question of tribal, not federal, law, and we therefore owe deference to tribal determinations of their own membership. The case law establishes unmistakably that "[a] tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n. 32, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *accord Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 880 (2d Cir.) (recognizing that among the foremost powers retained by the Indian tribes in the exercise of their quasi-sovereign status is the right, "absent limitation by treaty or federal statute . . . to determine questions of membership"), *cert. denied*, 519 U.S. 1041, 117 S.Ct. 610, 136 L.Ed.2d 535 (1996); *Martinez v. S. Ute Tribe*, 249 F.2d 915, 920 (10th Cir.1957) (collecting cases), *cert. denied*, 356 U.S. 960, 78 S.Ct. 998, 2 L.Ed.2d 1067 (1958). As the Cohen treatise on federal Indian law explains, "[t]he power of an Indian tribe to determine questions of its own membership derives from the character of an Indian tribe as a distinct political entity." Cohen, *supra*, at 20.

For this reason, federal courts generally defer to the decisions of the Indian tribes regarding their membership. *See, e.g., Smith v. Babbitt*, 100 F.3d 556, 558–59 (8th Cir.) (deferring to the Mdewakanton Sioux Tribe's Constitution's terms defining tribal membership), *cert. denied, Feezor v. Babbitt*, 522 U.S. 807, 118 S.Ct. 46, 139 L.Ed.2d 12 (1997); *Montgomery III v. Flandreau Santee Sioux Tribe*, 905 F.Supp. 740, 746 (D.S.D.1995) (disclaiming subject matter jurisdiction to inquire into "whether plaintiffs were wrongfully denied enrollment in the Tribe"); *Prairie Band of Potawatomi Indians v. United States*, 143 Ct.Cl. 131, 165 F.Supp. 139, 153 (1958) ("[I]t seems conclusive that the [Indian] Nation, who in the absence of congressional action, has the power to determine membership, denied membership to the non-emigrant Potawatomi.") *cert. denied, Hannahville Indian Cmty. v. Prairie Band of Potawatomi Indians*, 359 U.S. 908, 79 S.Ct. 587, 3 L.Ed.2d 574 (1959).

8. I do not think that the absence of evidence that Congress made the land now claimed by Thompson alienable necessarily requires the conclusion that Thompson does not have valid title. For example, although title to Indian lands passes only pursuant to a congressional act, it is within Congress's power to pass title and make its intent clear that no diminishment of the reservation takes place. But without evidence of a congressional act either to pass title or to make the land fully alienable, I conclude that there was no diminishment of the reservation.

Here, Thompson submitted an affidavit to the district court from the clerk of the St. Regis Tribe indicating that the Tribal Council, which exercises "overall responsibility for [the] membership code," had taken no action on Thompson's "Letter of Retraction," and "accordingly[, she] remains an enrolled member of the Tribe." J.A. 204 (citing Membership Code of the St. Regis Band of Mohawk Indians, § II, ¶ 6). While the district court conceded that it "does not pretend to know or to completely understand what it means to be a Tribal member," it nonetheless expressed skepticism that the Tribal Council's "inaction" could be deemed a decision to decline to disenroll Thompson. *Thompson IV*, 180 F.R.D. at 224 n. 15. And although it is not evidence, it is still worthy of note that the St. Regis Tribe, as *amicus curiae*, confirms the view expressed by its clerk and protests the district court's "interference" with its "exclusive right to determine internal matters of tribal membership." Br. for the St. Regis Band of Mohawk Indians at 9. Under the circumstances, and absent evidence establishing that the *St. Regis Tribe* terminated Thompson's membership, I would conclude that the district court erred by assuming itself the authority to determine the meaning of the Tribal Council's failure to act on Thompson's purported letter of resignation.

The district court relied on Cohen's treatise for the proposition that "tribal membership is a bilateral relation, depending for its existence not only upon the action of the tribe but also upon the action of the individual concerned [who may] terminate the tribal relationship whenever he or she so chooses." *Thompson IV*, 180 F.R.D. at 225 (citing Cohen, *supra*, at 22; emphasis deleted). That does not mean, however, that *any* given act that appears to disavow tribal membership prevails against tribal law or custom to the con-

trary. The district court, in other words, failed to distinguish between the existence of the right to terminate membership, on the one hand, and the act or acts that an individual must perform to exercise that right, on the other.

There is no dispute that Thompson has a right to terminate her tribal membership. But we know nothing about what acts the St. Regis Tribe deems effective to exercise that right. "[A] tribe may determine who are to be considered members by written law, custom, intertribal agreement, or treaty with the United States." Cohen, *supra*, at 248; *see also id.* at 20–23 (discussing the broad scope of a tribe's authority over its own membership). The law or custom of the St. Regis Tribe may be to give effect to purported letters only if they have been executed before the proper tribal authority. We do not know. Under United States federal law, a letter addressed to the government purporting to renounce American nationality would be insufficient to revoke a citizens's nationality. *See* 8 U.S.C. § 1481(5)-(6) (prescribing requirements for the voluntary renunciation of nationality, including that it be performed either "before a diplomatic or consular officer" or in writing "in such form as may be prescribed by, and before such officer as may be designated by, the Attorney General"). Has the St. Regis Tribe adopted a comparable law or custom setting forth the requirements for an individual to renounce tribal membership? We do not know. To assume that none exists, and to discredit the tribal clerk's affidavit affirming that Thompson remains a member of the St. Regis Tribe, would be, in my view, to decide questions generally beyond the scope of federal authority.

I do not doubt, in short, that Thompson enjoys the right to sever her relationship with the St. Regis Tribe by taking the appropriate steps. But federal courts' au-

thority to assess this relationship remains circumscribed; in general, it is limited to those circumstances in which a federal statute or treaty is at issue. *Poodry*, 85 F.3d at 880 (affirming that Indian tribes retain the right, "absent limitation by treaty or federal statute[,] ... to determine questions of membership"); *cf. Santa Clara Pueblo*, 436 U.S. at 72 n. 32, 98 S.Ct. 1670 ("Given the often vast gulf between tribal traditions and those with which the federal courts are more intimately familiar, the judiciary should not rush to create causes of action that would intrude on these delicate matters [i.e., decisions about tribal membership].").

Affording due deference to the St. Regis Tribe, I would decline to question the representation of its clerk, reiterated in the Tribe's amicus curiae brief, that under the law or custom of the St. Regis Tribe, Thompson remains a member notwithstanding her purported resignation letter.

### VI.

" 'Absent cession of jurisdiction or other federal statutes permitting it,' ... a State is without power to tax reservation lands and reservation Indians." *Chickasaw Nation*, 515 U.S. at 458, 115 S.Ct. 2214 (quoting *Yakima*, 502 U.S. at 258, 112 S.Ct. 683). Thompson may well be a "reservation Indian[ ]," viz., a member of the St. Regis Tribe, and her property remains within "reservation lands," i.e., within the jurisdiction of the St. Regis Reservation. The record before us reveals no "unmistakably clear" congressional intent, *see Yakima*, 502 U.S. at 258, 112 S.Ct. 683, to authorize state and local taxation within the Reservation's jurisdiction. Assuming Thompson is indeed a member of the tribe, her land would therefore enjoy immunity from the County's *ad valorem* tax.

Judge Hurd, quoting the Supreme Court, recently observed by way of preface to his resolution of another dispute over the legal status of Indian lands: " 'This litigation makes abundantly clear the necessity for congressional action.' " *City of Sherrill*, 145 F.Supp.2d at 231 (quoting *County of Oneida*, 470 U.S. at 253, 105 S.Ct. 1245) (emphasis deleted). There is force in that observation. Thompson's claim similarly raises a number of issues of federal Indian law that reflect the probable wisdom of a congressional attempt systematically to reconcile the diverse and often discordant laws and policies adopted toward Native Americans during different historical periods. The present regime is a convoluted and at times anachronistic body of law, some of which seems to be in tension with itself.

I recognize that it makes little sense for an Indian to be able to buy taxable land in an Indian reservation and thereby render it non-taxable. But that seems to arise from Congress's 1948 decision to decouple title and jurisdiction—in this case, reservation status—with the specific intent to, *inter alia,* "resolve several problems generated by the prior law regarding unrestricted fee simple lands within reservation boundaries, which had tied Indian country status to Indian land title." Cohen, *supra,* at 35. This odd result can be adjusted with the swipe of a congressional pen, making it "unmistakably clear" that land such as Thompson's is subject to state and local taxation. But I cannot find authority for us to do so. By its redefinition of "Indian country" in 1948, Congress decoupled jurisdiction and title, perhaps resolving some problems, *see* Cohen, *supra,* at 35, but as "this litigation makes abundantly clear," *Oneida Indian Nation,* 470 U.S. at 253, 105 S.Ct. 1245, creating others. I would reverse, perhaps remand, and, because I think we must, leave it to Congress to cure them.